IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

NEW MEXICO HORSEMEN'S ASSOCIATION,

    Petitioner/Counter-Defendant/Defendant in Intervention,

v.                                                                                                     No. 1:24-cv-00235-MLG-DLM

SUNRAY GAMING OF NEW MEXICO, L.L.C.,
dba SUNRAY PARK & CASINO,

    Respondent/Counterclaimant/Third-Party Plaintiff,

and

DOWNS AT ALBUQUERQUE, INC., dba
THE DOWNS RACETRACK & CASINO, and
ALL-AMERICAN RUIDOSO DOWNS, LLC, dba
RUIDOSO DOWNS RACETRACK AND CASINO,

    Plaintiffs in Intervention/Third-Party Plaintiffs,

v.

DR. PAUL JENSON, DVM, and
SEAN ALFORTISH,

    Third-Party Defendants.

**MEMORANDUM OPINION AND ORDER ON
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

    The New Mexico Horsemen's Association ("NMHA") is a non-profit organization that represents owners and trainers of racehorses in New Mexico. Doc. 67 at 2 ¶ 5. Following a contract dispute, NMHA sued SunRay Park & Casino ("SunRay"), The Downs Racetrack and Casino ("Albuquerque Downs"), and Ruidoso Downs Racetrack and Casino ("Ruidoso Downs") (collectively, "Racetracks") for alleged violations of the federal Interstate Horseracing Act ("IHA"), 15 U.S.C. §§ 3001-3007. *See generally* Doc. 67. In its First Amended Complaint

("FAC"), NMHA seeks declaratory and injunctive relief and damages. *Id.* at 19-21. The Racetracks now move to dismiss NMHA's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 70 at 2.

For the reasons that follow, the Court will grant the Racetracks' Motion to Dismiss First Amended Complaint ("Motion"). *Id.*

## BACKGROUND

NMHA has represented horsemen in New Mexico since 1966. Doc. 67 at 3 ¶ 6. NMHA claims to be the "largest . . . advocacy group representing racehorse owners and trainers in the State of New Mexico[,]" and has elected local committees at every horseracing track in the state.[1] *Id.* at ¶¶ 7, 11. The Racetracks are licensed to host races under New Mexico law. *Id.* at ¶ 12. At least one of the Racetracks (Ruidoso Downs) simulcasts its races out-of-state for purposes of off-track wagering. *See id.* at 8-9 ¶ 31.

In early 2024, NMHA sent draft consent agreements to the Racetracks in an effort to negotiate NMHA's role in the 2024 race season. *Id.* at 8 ¶¶ 27-28, 30; *see also* Doc. 67-1; Doc. 67-2. The Racetracks declined to execute those contracts and continue in their refusal to deal with NMHA. *See* Doc. 67 at 8 ¶ 31-9 ¶ 32. Despite this ongoing dispute, and lacking an agreement with

---

[1] NMHA membership is opt-out, in that racehorse owners, trainers, and breeders are deemed (without their express consent) to be NMHA members unless they affirmatively report that they want out of the organization. *See* Mot. Hr'g Tr. at 160:22-161:21 (Nov. 22, 2024) (discussing the opt-out nature of NMHA's membership structure); *see also* Doc. 67 at 2 ¶ 5 (alleging that NMHA's membership is "comprised of those owning, breeding, caring for race horses and those who are training and racing horses in the State of New Mexico."); Doc. 74 at 6 (remarking that NMHA relies on a "self-serving definition of its membership" in support of its claim to be the largest horsemen's group in New Mexico).

2

NMHA,[2] Ruidoso Downs conducted its 2024 race meet and simulcasted races for off-track wagering outside the state. *Id.* at 8 ¶ 31.

The Racetracks took further action against NMHA in the wake of the contract dispute. SunRay and Ruidoso Downs banned NMHA's board of directors from their facilities. *Id.* at 9 ¶ 33; *see also* Doc. 67-4; Doc. 67-5. Albuquerque Downs began refusing NMHA directors stalls for their race horses. Doc. 67 at 9 ¶ 34. Albuquerque Downs and Ruidoso Downs also started requiring racehorse trainers who participate in race meets to enter agreements appointing the tracks' own horsemen's groups as their representatives in the requisite off-track wagering process. *Id.* at 9-10 ¶ 35; Doc. 67-6 (Ruidoso Downs Safety Agreement); Doc. 67-7 (Albuquerque Downs Racetrack Lease Agreement). The agreements state that the local horsemen's groups are responsible for negotiating horseracing contracts with Albuquerque Downs and Ruidoso Downs. Doc. 67-6 at 2; Doc. 67-7 at 3. If trainers refuse to sign, they are excluded from racing or obtaining stalls for their horses. Doc. 67 at 9-10 ¶ 35; 15 ¶ 48.

The fallout spurred the present litigation. NMHA first sued SunRay and sought a temporary restraining order, Doc. 1; Doc. 2, which the Court denied. Doc. 17. SunRay responded with its own counterclaims and sought equitable relief and damages. *See* Doc. 6. Ruidoso Downs and Albuquerque Downs intervened, *see* Doc. 11; Doc. 22, and filed their own third-party complaint, which additionally named Defendants Jenson and Alfortish. *See* Doc. 23. NMHA subsequently filed its FAC, Doc. 67, and the Racetracks moved to dismiss. Doc. 70.

---

[2] Ruidoso Downs apparently had an agreement with the local horsemen's group formed at its racetrack. *See* Doc. 67 at 9-10 ¶ 35; Doc. 67-6.

**STANDARD OF REVIEW**

Under Rule 12(b)(6), the Court accepts all well-pleaded factual allegations as true and construes them in the light most favorable to the plaintiff. *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020). Plaintiffs must put forth facts stating a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, the Court need not accept "'a legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**DISCUSSION**

I.   **The Interstate Horseracing Act**

In 1978, Congress passed the IHA, which regulates interstate horserace wagering. *See* 15 U.S.C. § 3001(b). The IHA forbids the acceptance of interstate off-track wagers except as it expressly permits. 15 U.S.C. § 3003. Relevant here, the IHA states that interstate off-track wagers may be accepted by off-track betting systems only when consent is obtained from the host racing association, the host racing commission, and the off-track racing commission, as those terms are statutorily defined. 15 U.S.C. § 3004(a)(1)-(3); *see also* 15 U.S.C. § 3002 (establishing statutory definitions). Before a host racing association can provide consent for an off-track betting system to accept wagers, the association "must have a written agreement with the horsemen's group, under which said racing association may give such consent, setting forth the terms and conditions relating thereto[.]" § 3004(a)(1)(A). The horsemen's group is, "with reference to the applicable host racing association, the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day[.]" § 3002(12). When there is no

4

written consent agreement between a host racing association and the relevant horsemen's group, and the racing association and the horsemen's group have engaged in a "regular contractual process," the parties must adhere to that process in negotiating the required consent agreement. § 3004(a)(1)(B).

## II.     NMHA's claims for relief

NMHA advances four claims for relief under the IHA. First, NMHA requests a declaration that the Racetracks must have a written agreement with NMHA before consenting to off-track wagering as required under § 3004(a)(1)(A), and if an agreement is not reached, that the Racetracks may not simulcast their races or enter simulcast agreements with any entity. Doc. 67 at 20 ¶ 1. Second, NMHA asks for an injunction requiring the Racetracks to negotiate and enter an agreement with NMHA as required under the IHA, and if no agreement is reached, that the Racetracks be enjoined from simulcasting their races. *Id.* at 20 ¶ 2. Third, NMHA seeks to preclude the Racetracks from requiring owners, trainers, or NMHA members and directors to sign contracts compelling the relevant party "to appoint any other group as the horseman's representative as a condition of entering racetrack grounds, using a racetrack stall, or participating in racing[.]" *Id.* at 20 ¶ 3. And fourth, NMHA requests that the Racetracks be enjoined from excluding or banishing NMHA directors, officers, or members from their respective facilities. *Id.* at 21 ¶ 4.

## III.    Enforcement of the IHA's consent provisions

NMHA's first and second claims for relief invoke the consent requirements established by § 3004. *Id.* at 18 ¶¶ 66-67. To enforce those provisions, NMHA must plausibly allege that it is the "horsemen's group" as contemplated by the IHA. *See* 15 U.S.C. § 3006(a). NMHA must also state a cognizable violation of the IHA; namely, that the Racetracks accepted off-track wagers without the consent of the relevant horsemen's group. *See* § 3004(a)(1)(A) (stating the conditions required

for the acceptance of such wagers). As explained below, NMHA's FAC fails to meet these requirements.

### A. NMHA's status as the "horsemen's group"

15 U.S.C. § 3006(a) authorizes host racing associations and relevant horsemen's groups to commence civil actions for violations of the IHA. Here, the Racetracks argue that NMHA does not plausibly allege that it fits within the definition of "horsemen's group" stated in § 3002(12). Doc. 70 at 10. That section defines a horsemen's group as that which represents the majority of trainers and owners on a given track on a particular day. *New England Horsemen's Benevolent & Protective Ass'n v. Mass. Thoroughbred Horsemen's Ass'n*, 210 F. Supp. 3d 270, 276 (D. Mass. 2016) [hereinafter, *New England HBPA*]. Put another way, it does not matter which group represents horsemen at the state level. The salient inquiry is which group represents the majority of owners and trainers at a track on a race day. *Id.* So, § 3002(12)'s definition is not exclusive, and instead depends on day-to-day circumstances at specific racetracks. *Churchill Downs, Inc. v. Thoroughbred Horsemen's Grp., LLC*, 605 F. Supp. 2d 870, 892 (W.D. Ky. 2009) ("The IHA defines horsemen's group in relation to a particular racetrack.").

*New England HBPA* provides an illustrative application of these principles. There, the New England HBPA sought a declaration that it was the horsemen's group under § 3002(12) in a dispute with a rival horsemen's group (MassTHA) and a race organizer (MAS). *See New England HBPA*, 210 F. Supp. 3d at 271. As a condition for entering its races, MAS required owners and trainers to appoint MassTHA as their representative horsemen's group. *See id.* at 273. The New England HBPA challenged this requirement, arguing that it represented the majority of horsemen in Massachusetts and that this fact, in itself, established it as the horsemen's group under the IHA. *Id.* at 276. The court disagreed, reasoning, "Under the IHA, it does not matter who represents the

majority of horsemen in the state[.]" *Id.* at 275. Instead, it only mattered who represented the majority of racehorse owners and trainers (1) at the subject racetrack (2) in a race with interstate off-track wagering (3) on a particular race day. *Id.* at 276. Because MAS required *all* trainers and owners to be represented by MassTHA as a precondition to entering its races, MassTHA represented the majority of horsemen at MAS races, making it the horsemen's group under the IHA. *Id.*

While *New England HBPA* is not binding on this Court, it demonstrates that § 3002(12)'s definition functions on a particularized level. The IHA does not demand that a horsemen's group represent owners and trainers broadly. The plain language of the act requires only that a putative horsemen's group represent the majority of owners and trainers at a given track on a given race day; the IHA's definition of horsemen's group is bereft of any text related to statewide or other general representation. *See* § 3002(12); *see also New England HBPA*, 210 F. Supp. 3d at 276; *Churchill Downs, Inc.*, 605 F. Supp. 2d at 892. Accordingly, to plausibly allege that it was the horsemen's group under the IHA, NMHA must state in the FAC that it represented the majority of owners and trainers at the Racetracks on particular race days when races were offered for interstate off-track wagering.

NMHA fails to do so. The FAC's allegations regarding NMHA's status as the horsemen's group are all framed broadly. For instance, NMHA states that it has represented horsemen in New Mexico since 1966 and is the largest advocacy group for racehorse owners and trainers in the state. Doc. 67 at 3 ¶¶ 6-7. NMHA further alleges that a New Mexico state court recognized it as the largest New Mexico horsemen's group in 2023. *Id.* at ¶ 8. These allegations, without more, do not establish that NMHA represented the majority of owners and trainers at any of the Racetracks on

any race day; the FAC contains no allegations relating to specific races offered for interstate off-track wagering by the Racetracks.

Moreover, the FAC alleges that Ruidoso Downs and Albuquerque Downs now condition owners and trainers' participation in their race meets on the execution of contracts appointing local "stalking-horse" groups as the horsemen's groups for given races. *Id.* at 9 ¶ 35. Functionally, these allegations and the related contracts, Docs. 67-6 & 67-7, establish the existence of alternative, unanimously appointed horsemen's groups at Ruidoso Downs and Albuquerque Downs for all race days. This arrangement is analogous to the one in *New England HBPA*, where MAS required horsemen to appoint MassTHA as the horsemen's group as a precondition to race participation. 210 F. Supp. 3d at 276. That decision and its reasoning apply equally here: a unanimously appointed horsemen's group at a track on a particular race day is the horsemen's group under the IHA, not a rival entity with statewide majority representation. NMHA has alleged that it is the latter, not the former. Accordingly, the FAC's enforcement claims must be dismissed because NMHA has not established itself as the horsemen's group for purposes of this dispute.

### B. Violation of the IHA

NMHA also fails to allege an actionable violation of the IHA. The act's core provision states, "No person may accept an interstate off-track wager except as provided in this chapter." § 3003. The next section lays out the conditions under which interstate off-track wagering may occur, including the requirement that the host racing association provide its consent. § 3004(a)(1). That consent is in turn preconditioned on the written agreement of the relevant horsemen's group. § 3004(a)(1)(A). The consent of the horsemen's group may not be withdrawn or varied "except in

the regular contractual process" when the racing association and the horsemen's group have previously engaged in such a process. § 3004(a)(1)(B).

The IHA is clear that it prohibits the acceptance of illegal off-track wagers absent the required consents. *See* §§ 3003, 3004. Indeed, the IHA's liability and damages provision states that violators are liable for "accepting any interstate off-track wager in violation of this chapter." 15 U.S.C. § 3005. So, to state a claim for an IHA violation in this case, NMHA must allege that the Racetracks actually accepted interstate off-track wagers. *See New England HBPA*, 210 F. Supp. 3d at 277 ("Thus, the only entity that can be liable for damages under the IHA is one that accepts interstate off-track wagers without having obtained the proper consent[.]").

The FAC again fails to cross the starting line. It contains no allegations that the Racetracks accepted any legal or illegal interstate off-track wagers. The only substantive allegation relating to the acceptance of wagers applies to Ruidoso Downs, which allegedly "started its 2024 race meet and is conducting interstate simulcasting for purposes of permitting interstate off-track wagering" without NMHA's consent. Doc. 67 at 8-9 ¶ 31, 11-12 ¶ 40. This allegation only establishes that Ruidoso Downs simulcasts its races so that other out-of-state off-track betting systems can collect wagers; it does not aver that Ruidoso Downs (or any other Racetrack) is accepting interstate off-track wagers in violation of the IHA. At best, the FAC alleges that Ruidoso Downs is permitting its simulcast signals to be used by other off-track betting systems without NMHA's consent.[3] This fact, however, does not support a claim for relief under the IHA, which creates liability for those

---

[3] Had NMHA successfully established itself as the horsemen's group for Ruidoso Downs, it could have brought actionable IHA claims against the off-track betting systems that accepted interstate wagers on Ruidoso Downs's simulcasts. Section 3005 expressly provides for this type of liability and establishes statutory requirements for calculating resultant damages. *See Horseman's Benevolent & Protective Ass'n v. Zonak*, No. 2:07-cv-00057, 2008 WL 11453695, at *14 (S.D. Ohio Sept. 23, 2008) (finding an off-track betting system liable to a horsemen's group under the IHA for accepting off-track wagers without the group's consent).

9

individuals who accept interstate off-track wagers, not tracks that simulcast their signals absent consent from the relevant horsemen's group. *See New England HBPA*, 210 F. Supp. 3d at 277; *see also Los Angeles Turf Club v. Horse Racing Labs, LLC*, No. CV 15-09332, 2017 WL 11634526, at *5 (C.D. Cal. May 15, 2017) (requiring a plaintiff to prove that the defendant accepted an interstate off-track wager); *Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 294 F. Supp. 2d 1291, 1302 (M.D. Fla. 2003) (noting in a parenthetical that § 3005 provides standing to *out-of-state* horsemen's groups to bring actions under the IHA).

Despite the lack of allegations related to interstate off-track wagering, NMHA argues that the FAC establishes that the Racetracks sought to circumvent § 3004(a)(1)(B)'s requirement that host racing associations reach written consent agreements with horsemen's groups through a "regular contractual process." Doc. 82 at 10. NMHA relies heavily on *Kentucky Division, Horsemen's Benevolent & Protective Ass'n v. Turfway Park Racing Ass'n* 20 F.3d 1406 (6th Cir. 1994) [hereinafter, *Turfway*], which broadly established the constitutionality of the IHA. *Id.* at 1415-17. Specifically, NMHA argues that *Turfway* requires a host racing association to negotiate and contract only with the horsemen's group chosen by the majority of owners and trainers to act on their behalf. Doc. 82 at 10-11 (citing *Turfway*, 20 F.3d at 1413-14). NMHA further contends that by taking affirmative steps to circumvent the IHA by using their own "faux" horsemen's groups, the Racetracks violated the directive that consent to interstate off-track wagering must be attained from the horsemen's group through a regular contractual process. *Id.* at 11.

NMHA's reliance on *Turfway* is unavailing. *Turfway* provides only "one permissible interpretation" of the IHA and notes that while the IHA is not unconstitutionally vague, its language is still "imprecise and subject to interpretation." 20 F.3d at 1413. Consequently, *Turfway's* holding that the IHA "suggests that a racetrack obtain the horsemen's consent during regular contractual

10

negotiations with the trade association that the horsemen choose to represent them" is not definitive or controlling. *Id.* at 1413-14. But even if it were, the FAC contains no allegations that owners and trainers at the Racetracks attempted to select NMHA as the "trade association" to represent them in dealing with the Racetracks. On this ground alone, the FAC would not pass muster under *Turfway*.

The *Turfway* Court further reasoned that in passing the IHA, "Congress intended to preserve the traditional relationships between the parties in the horseracing industry[.]" 20 F.3d at 1414. This intent precludes a host racing association from abandoning routine contractual negotiations with horsemen's groups when those negotiations stall. *Id.* But here, there are no allegations establishing that NMHA and the Racetracks engaged in a regular contractual process prior to 2024. The only contractual dealings referenced in the FAC occurred when NMHA's president sent draft consent agreements with the Racetracks for the 2024 race season. Doc. 67 at 8 ¶¶ 27-30. There are no claims that this communication occurred pursuant to a routine process or some traditional relationship between the parties. In fact, the FAC does not allege any sort of relationship between NMHA and the Racetracks prior to 2024. It instead relies entirely on allegations that it has long been the state-level representative trade group to establish the predicate relationship. *Id.* at 3 ¶ 6. Even under *Turfway's* interpretation, the FAC's allegations are insufficient.

In sum, NMHAs fails to state plausible claims for relief under the IHA's consent provisions. NMHA has not established itself as the relevant horsemen's group as defined by § 3002(12). Further, the FAC contains no allegations that any of the Racetracks accepted an illegal interstate off-track wager. To the extent the IHA may permit civil actions for violations of the regular contractual process referenced in § 3004(a)(1)(B), NMHA does not allege any facts establishing

11

that it engaged in such a process with the Racetracks, much less an abandonment of that process. Accordingly, the Court grants the Racetracks' request to dismiss NMHA's enforcement claims.

## IV. NMHA's contract and exclusion theories

NMHA's remaining claims for relief do not make it out the gate. The third claim, which seeks to invalidate the allegedly unconscionable stall agreements required by Ruidoso Downs and Albuquerque Downs, fails on statutory and common law bases. *See* Doc. 67 at 15 ¶ 49-16 ¶ 50. The IHA does not provide a cause of action for parties seeking to challenge third-party contracts, and so NMHA cannot challenge the subject agreements pursuant to the IHA's terms. Moreover, NMHA does not allege that it is a party to any of the "adhesion contracts" it describes in the FAC, nor does it allege any facts establishing it as a third-party beneficiary of those contracts. Doc. 67 at 9 ¶ 35. Accordingly, NMHA lacks standing to bring a contractual challenge. *See Great Am. Ins. Co. of N.Y. v. W. States Fire Prot. Co.*, 730 F. Supp. 2d 1308, 1316 (D.N.M. 2009) (discussing contractual standing under New Mexico law).

Similarly, NMHA's fourth claim—requesting an order compelling the Racetracks to allow NMHA's directors, officers, and members access to their facilities—is without support. *See* Doc. 67 at 21 ¶ 4. Like the contract claim, the IHA provides no statutory basis to challenge a racetrack's choice to exclude certain individuals, including members of a horsemen's group. More importantly, New Mexico law provides the Racetracks with statutory, administrative, and common-law rights to exclude any person from their facilities for any lawful reason. *See* NMSA 1978, § 60-1A-28.1(B); NMAC 15.2.2.8(V); *see also Carillo v. My Way Holdings, LLC*, 2017-NMCA-024, ¶ 2, 389 P.3d 1087 (holding that "racetracks in New Mexico possess a common law right to exclude any person—patron or licensee—for any reason other than those specified in the New Mexico Human Rights Act."). NMHA alleges that the Racetracks have "banished" NMHA's

directors and refused to provide them with horse stalls, Doc. 67 at 9 ¶¶ 33-34, but fails to state any unlawful reason for doing so. Lacking any cognizable allegations or legal support, this claim must be dismissed.

## CONCLUSION

For the foregoing reasons, NMHA's claims fail across the board. The Court grants the Racetracks' Motion, Doc. 70, and dismisses NMHA's First Amended Complaint, Doc. 67, with prejudice.

It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA