## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

NEW MEXICO HORSEMEN'S ASSOCIATION,

      Petitioner/Counter-Defendant/Defendant in Intervention,

v.                                     No. 1:24-cv-00235-MLG-DLM

SUNRAY GAMING OF NEW MEXICO, L.L.C.,
dba SUNRAY PARK & CASINO,

      Respondent/Counterclaimant/Third-Party Plaintiff,

and

DOWNS AT ALBUQUERQUE, INC., dba
THE DOWNS RACETRACK & CASINO, and
ALL-AMERICAN RUIDOSO DOWNS, LLC, dba
RUIDOSO DOWNS RACETRACK AND CASINO,

      Plaintiffs in Intervention/Third-Party Plaintiffs,

v.

DR. PAUL JENSON, DVM, and
SEAN ALFORTISH,

      Third-Party Defendants.

## MEMORANDUM OPINION AND ORDER ON
## PRELIMINARY INJUNCTION AND JOINT MOTION TO DISMISS

The New Mexico Horsemen's Association ("NMHA") sued Sunray Park & Casino

("SunRay"), The Downs Racetrack & Casino ("Albuquerque Downs"), and Ruidoso Downs

Racetrack and Casino ("Ruidoso Downs") (collectively, "Racetracks") for alleged violations of

the federal Interstate Horseracing Act ("IHA"), 15 U.S.C. §§ 3001-3007.[1] _See_ Docs. 2 (Complaint),

---

[1] The Court previously issued a memorandum opinion and order dismissing NMHA's First
Amended Complaint with prejudice. _See_ Doc. 92 at 13. The Court included a discussion on the
structure and history of the IHA, _id._ at 4-5, which it incorporates here. The Court also incorporates

67 (First Amended Complaint). The Racetracks counterclaimed for damages and injunctive relief against NMHA and two of its board members, Dr. Paul Jenson and Sean Alfortish (collectively, "NMHA Defendants"). *See* Doc. 6 at 6-22 (SunRay's Counterclaims); Doc. 23 (Albuquerque Downs & Ruidoso Downs's Intervenor Complaint).[2] The Racetracks subsequently moved for a preliminary injunction. *See* Doc. 25. In response, the NMHA Defendants filed a motion to dismiss all the Racetracks' claims. *See* Doc. 44. For the reasons that follow, the Court declines to issue a preliminary injunction and grants in part and denies in part the NMHA Defendants' motion to dismiss. *Id.*

## BACKGROUND

### I.    Relevant Facts

The Racetracks are gaming facilities licensed by the New Mexico Racing Commission ("NMRC") to offer wagering on horse racing and to host horserace meets. Doc. 23 at 3 ¶¶ 9-10. The NMRC permits the Racetracks to accept wagers on simulcast horseraces taking place out of state and to export simulcast signals of their own on-track races to approved locations across the country. *Id.* at ¶¶ 12-14.

Interstate wagering on those races is federally regulated by the IHA. At issue is a provision requiring assent from the relevant horsemen's group before interstate wagers may be accepted by an off-track betting system. *See* 15 U.S.C. § 3004(a)(1)(A). As applied here, § 3004(a)(1)(A) requires the Racetracks to obtain consent from the applicable horsemen's group[3] before sending

---

its extensive analysis of the IHA's consent structure, which bears heavily on the issues presented. *See id.* at 5-12.

[2] The counterclaims raised by each of the Racetracks are substantively identical. For ease of use, the Court refers to the Intervenor Complaint, Doc. 23, throughout this order.

[3] The IHA defines "horsemen's group" as "the group which represents the majority of owners and trainers racing [at a host racing association], for the races subject to the interstate off-track wager

their race signals to off-track betting systems in other states. And the Racetracks may take bets on races occurring in other states only if the relevant horsemen's group in that locale agrees. *Id.* These statutory requirements precipitated the current litigation.

NMHA maintains that it is the sole horsemen's group in the State of New Mexico, as that term is defined by the IHA. Doc. 23 at 3 ¶ 17, 7 ¶¶ 47-48. To substantiate this assertion, the NMHA claims membership of between 3,000 and 5,000 horserace industry participants and self identifies as the "oldest, strongest, largest, and last remaining watchdog over the sport of horseracing in New Mexico." *Id.* at 4 ¶¶ 20-21; Doc. 44 at 3. Jenson and Alfortish are of the same mind. They have publicly asserted that NMHA is the only horsemen's group legally entitled to negotiate with the Racetracks. Doc. 23 at 7 ¶¶ 48-49.

The Racetracks dispute these contentions. *Id.* at 4 ¶ 22, 7 ¶ 44. They point out that owners and trainers do not affirmatively join the organization or pay dues. *Id.* at 4 ¶ 23 Rather, NMHA deems them to be members unless they opt-out via a written notification to NMHA's board of directors. *Id.* Thus, NMHA claims them as de facto members unless they follow organizational procedures disclaiming otherwise.

The Racetracks also note that the IHA defines horsemen's group as, "with reference to the [applicable] host [racing association], the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day." *Id.* at 6 ¶ 39 (citing 15 U.S.C. § 3002(12)). They interpret this language as defining a horsemen's group "in terms of who represents the majority of those racing on a particular track on a particular day." *Id.* at ¶ 40. Indeed, after their relationship with NMHA soured, Ruidoso Downs and

---

on any racing day[.]" 15 U.S.C. § 3002(12); *see also* Doc. 92 at 4-8 (discussing how the definition functions within the context of the IHA's consent provisions).

Albuquerque Downs formed local horsemen's committees which have since represented trainers and owners at those specific tracks. *See* Doc. 25-1 at 3 ¶ 14 (affidavit testimony regarding the Downs at Albuquerque's Horsemen's Committee); Mot. H'rg. Tr. at 35:23-36:21, Nov. 22, 2024 (oral testimony establishing the existence of the Ruidoso Downs Horsemen's Group), 55:11-22 (same with regard to the Downs's of Albuquerque Horsemen's Committee); *see also* Doc. 67 at 9-10 ¶ 35 (NMHA alleging the existence of local "stalking-horse" groups).

The Racetracks further claim that Defendant Sean Alfortish, an NMHA board member, threatened the Racetracks with financial harm if they continued to refuse to negotiate with NMHA. Doc. 23 at 7 ¶ 49. Seeking to leverage its position—and consonant with Alfortish's threat—NMHA actively lobbied horsemen's groups in other states to withhold their consent for simulcasting to the Racetracks. *Id* at 8 ¶ 53. Several of those organizations acquiesced, preventing the Racetracks from offering interstate horserace wagering to their customers. *Id.* at ¶ 56; Racetracks' Hr'g Ex. B (communications regarding the withdrawals of consent from horsemen's groups in eight states). Chief among these groups was the Kentucky Horsemen's Benevolent and Protective Association ("Kentucky HPBA"), which precluded the Racetracks from simulcasting all Kentucky races, including the Kentucky Derby. Doc. 23 at 9 ¶¶ 57-60, 11 ¶ 72; Racetracks' Hr'g Ex. B (in relevant part, letters from Kentucky HBPA to Kentucky race tracks withdrawing consent to simulcast races to New Mexico). The NMHA Defendants' campaign prompted two out-of-state tracks to cancel existing simulcast agreements with the Racetracks because the relevant horsemen's groups withdrew their consent to send race signals to New Mexico. Racetracks' Hr'g Ex. B (correspondence cancelling simulcast agreements from Keeneland in Lexington, Kentucky and Emerald Downs in Washington).

## II.    Procedural History

These facts have resulted in contentious litigation between the NMHA and the Racetracks. The NMHA was first out the gate when it filed the initial complaint against the Racetracks. *See* Doc. 2. The Racetracks answered and filed their counterclaims against NMHA, Alfortish,[4] and NMHA's president, Dr. Paul Jenson. *See generally* Doc. 6 at 6-22 (SunRay's Counterclaims); Doc. 23 (Albuquerque Downs & Ruidoso Downs's Intervenor Complaint). The Racetracks seek declaratory and injunctive relief, antitrust remedies, and state law tort damages. Doc. 23 at 9-15, ¶¶ 62-109. The Court subsequently dismissed NMHA's Complaint under Federal Rule of Civil Procedure 12(b)(6). *See generally* Doc. 92. That dismissal, however, did not resolve the Racetracks' counterclaims, and this case now rounds the first turn.

At issue is the Racetracks' motion for preliminary injunction, Doc. 25, and NHMA Defendants' motion to dismiss, Doc. 44. The NMHA Defendants contest the Racetracks' entitlement to preliminary relief and seek to dismiss each of the pending counterclaims. Because these requests arise from the same set of facts, and raise overlapping legal questions, the parties' seemingly disparate motions are addressed collectively. The Court begins with Racetracks' motion for preliminary injunction (which it denies) and then addresses the NMHA Defendants' motion to dismiss (which it grants in part and denies in part).

---

[4] Alfortish is a defendant in another matter, although in that role he faces a number of federal criminal charges pending in the Eastern District of Louisiana. *See* Press Release, United States Attorney's Office, Eastern District of Louisiana, Ten Count Indictment Unsealed Charging Eight Individuals and Two Law Firms with Offenses in Connection with Staged Automobile Collisions in the New Orleans Area (Dec. 9, 2024), https://www.justice.gov/usao-edla/pr/ten-count-indictment-unsealed-charging-eight-individuals-and-two-law-firms-offenses. He also previously pled guilty to federal charges of conspiracy to commit mail fraud, wire fraud, identity fraud, and health-care fraud in connection with claims he rigged the Louisiana Horsemen's Benevolent and Protective Association election. *See* Press Release, United States Attorney's Office, Eastern District of Louisiana, Former HBPA President Pleads Guilty to Conspiracy to Commit Mail Fraud, https://www.justice.gov/archive/usao/lae/news/2011/2011_08_31_sean_alfortish_plea.html.

## ANALYSIS

### I.    Preliminary Injunction

To obtain a preliminary injunction, the movant " a substantial likelihood of success on the merits, (2) irreparable injury in the absence of the injunction, (3) its threatened injury outweighs the harm to the opposing party under the injunction, and (4) the injunction is not adverse to the public interest." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1139 n.2 (10th Cir. 2017). The burden is on the movant, and "the right to relief must be clear and unequivocal" due to the extraordinary nature of preliminary injunctions as a remedy. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

Here, the Racetracks request an injunction intended to remedy their lost wagering revenue, reputational harm, and loss of goodwill. *See* Doc. 25 at 12-14; Doc. 50 at 5. Specifically, they seek an order that (1) precludes NMHA from interfering with the Racetracks' efforts to send or receive simulcast signals, and (2) compels NMHA to "send corrective communications to horseracing associations and horsemen's groups in other states" clarifying that NMHA is not the exclusive horsemen's group in New Mexico. Doc. 25 at 23-24. The problem for the Racetracks is that their proposed injunction—even if granted—does not redress their grievances.

According to the Racetracks, out-of-state horsemen's groups are withholding their consent to allow off-track wagering in New Mexico, ostensibly because of NMHA's efforts. *See id.* at 9-10; Racetracks' Hr'g Ex. B. The Racetracks are understandably upset about that result as it prevents them from taking bets on certain out-of-state races. *See* Doc. 25 at 10-11; Hr'g Tr. at 15:20-16:11. They characterize NMHA's actions as a "crusade" that is causing "far-reaching" damage to the Racetracks' business. *See* Doc. 25 at 9; Doc. 50 at 4-5. But there is no factual basis to conclude out-of-state horsemen's groups would alter their behavior if the requested injunction

were issued. Accordingly, the Racetracks have not met their burden on this aspect of the requested injunction. *See Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975) (noting a party seeking a preliminary injunction must establish each element by "clear proof").

Similarly, the Racetracks may accept interstate off-track wagers, notwithstanding NMHA's (unsubstantiated) claim as the lone horsemen's group in New Mexico. Indeed, the Racetracks have seeded local horsemen's groups that are legally authorized to provide (or deny) the requisite consent under the IHA. *See* Doc. 25-1 at 3 ¶ 14; Mot. H'rg. Tr. at 35:23-36:21, 55:11-22; Doc. 67 at 9-10 ¶ 35. For example, Albuquerque Downs continues to export its live race signals to other tracks around the country with the consent of its local horsemen's group, the Downs of Albuquerque Horsemen's Committee. Hr'g. Tr. at 55:2-7, 11-22. Ruidoso Downs also has a simulcast agreement with its own local entity, the Ruidoso Downs's Horsemen's Group. *Id.* at 36:17-24. Both Albuquerque Downs and Ruidoso Downs condition race participation on joining the local horsemen's groups. *See* Doc. 67-6 at 2 (Ruidoso Downs's stall application requiring appointment of the local horsemen's group as the signatory's sole representative for purposes of the IHA); Doc. 67-7 at 3 (Albuquerque Downs's stall application requiring the same). That condition renders the local horsemen's groups the relevant consent entities under the IHA. *See New England Horsemen's Benevolent & Protective Ass'n v. Mass. Thoroughbred Horsemen's Ass'n*, 210 F. Supp. 3d 270, 276 (D. Mass. 2016) (interpreting the IHA's definition of horsemen's group as that which represents the majority of trainers and owners on a specific track on a particular race day); *see also* Doc. 92 at 8 (discussing NMHA's failure to allege facts sufficient to establish itself as the statewide horsemen's group in this case). So, the Racetracks may (and do) export their race signals to out-of-state tracks for off-track wagering based on the consent of their local groups, regardless of NMHA's take on the issue. *See* 15 U.S.C. § 3004(a)(1)(A); *see also* Doc. 92 at 6-8

(discussing the IHA's consent structure and definition of "horsemen's group"). NMHA's consent is irrelevant, and an injunction compelling NMHA to cease its conduct would be of no moment.

Finally, to sustain their burden to show irreparable injury, the Racetracks must demonstrate "a significant risk that [they] will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citation modified). They have not met that standard. The evidence proffered so far shows the Racetracks primarily suffered monetary losses, which are inherently quantifiable and compensable by economic damages. *See* Hr'g Tr. at 26:18-21 (SunRay's general manager testifying, "We had different economic effects as far as the loss of food and beverage revenue, the loss of pari-mutuel betting on that particular day, [and] pari-mutuel wagering since this has started."); 40:17-41:19 (Ruidoso Downs's general manager detailing decreased revenue resulting from the loss of out-of-state simulcasting, including "$85,000" from the Kentucky Derby); 60:24-61:8 (Albuquerque Downs's general manager testifying to the economic harm the track suffered after losing out-of-state simulcast signals). Lost revenue is generally not a valid means of demonstrating irreparable harm for purposes of injunctive relief, and the Racetracks provide no persuasive basis to depart from that general rule. *Gunnison Cnty. Stockgrowers' Ass'n v. U.S. Fish & Wildlife Serv.*, 707 F. Supp. 3d 1056, 1066 (D. Colo. 2023) ("Economic loss does not typically constitute irreparable harm, as economic loss is fully compensable after the fact by money damages.").

Given the preceding, the Court finds that an injunction precluding NMHA from interfering with the Racetracks' efforts to simulcast their races out of New Mexico would not remedy any current harm, and the Racetracks have not shown that NMHA's efforts pose a definite and significant threat to the status quo. Put another way, the Racetracks have not established that NMHA's conduct poses a clear and significant risk to their existing off-track wagering

arrangements. *See Greater Yellowstone Coal.*, 321 F.3d at 1258. This failure to satisfy the irreparable harm requirement is ultimately dispositive. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (holding that a showing of irreparable harm is a threshold matter because it is the "single most important prerequisite" for preliminary injunctive relief). Consequently, the Court does not reach the remaining preliminary injunction factors. *See N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1255 (10th Cir 2017); *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) ("[T]he movant's failure to sustain its burden of proving irreparable harm ends the inquiry and the denial of the injunctive request is warranted." (citation modified)). The Racetracks' Motion for Preliminary Injunctive Relief, Doc. 25, is denied.

## II.    Motion to Dismiss

The NMHA Defendants move to dismiss the Racetracks' counterclaims under Rule 12(b)(6).[5] Doc. 44 at 1. They assert the Racetracks lack standing and challenge the counterclaims on the merits. *Id.* at 5-26. NMHA further argues that the Racetracks' requested injunction violates its First Amendment rights, *id.* at 8-11, while Jenson and Alfortish raise the federal Volunteer Protection Act, 42 U.S.C. § 14501, as shield against liability in this case. *Id.* at 11-12. The Court addresses each argument in turn.

### A.    Standing

The Racetracks have the burden to establish Article III standing. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). To clear that jurisdictional hurdle, the Racetracks must

---

[5] Under Rule 12(b)(6), the Court accepts all well-pleaded factual allegations as true and construes them in the light most favorable to the plaintiff. *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020). Plaintiffs must put forth facts stating a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

show: (1) a concrete, particularized, and actual or imminent injury in fact; (2) the injury is causally connected to NMHA's conduct; and (3) the injury is redressable by a favorable decision. *People for the Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 996-97 (10th Cir. 2017). Also relevant is prudential standing, "which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Newdow*, 542 U.S. at 11 (citation omitted). Unlike its constitutional analog, prudential standing "encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* at 12 (citation omitted). NMHA challenges the Racetracks' counterclaims under both theories. *See* Doc. 44 at 5-8. Given the posture of the case, the Racetracks have the burden to allege facts sufficient to establish standing at the threshold. *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).

Initially, NMHA contends the Racetracks lack standing under the IHA to compel "any of the consents required by the [IHA] without negotiating and securing the requisite consents." Doc. 44 at 6-7. This statement is facially accurate, as the IHA only provides an express right of action for the unauthorized acceptance of off-track wagers, which the Racetracks do not allege here. *See* 15 U.S.C. §§ 3003, 3006(a); *see generally* Doc. 23. The issue for NMHA is that the Racetracks do not pursue substantive relief under the IHA. Rather, they invoke the Declaratory Judgment Act, 18 U.S.C. § 2201, and ask the Court to declare that NMHA is not the sole IHA-defined horsemen's group in New Mexico. *See* Doc. 23 at 9-10 ¶¶ A-B. The outcome of that declaratory claim, in turn, bears on their antitrust and tort claims. *See id.* at 11-15 ¶¶ 76-109. So, the proper analysis is not whether the Racetracks have standing under the IHA, but instead whether they allege facts sufficient to establish standing for their substantive causes of action. *See Hialeah, Inc. v. Fla.*

10

*Horsemen's Benevolent & Protective Ass'n*, 899 F. Supp. 616, 621 (S.D. Fla. 1995) (noting that IHA standing is irrelevant in evaluating antitrust claims).

Under constitutional and prudential standards, the Racetracks meet their burden. The Racetracks allege that NMHA's efforts caused out-of-state horsemen's groups to withhold consent for simulcasts into New Mexico, resulting in lost wagering revenue, reputational harm, and disrupted contractual relations. Doc. 23 at 8-9 ¶¶ 56-61, 10 ¶ 71, 15 ¶¶ 103-104. These allegations establish particularized and concrete injuries directly linked to NMHA's conduct, satisfying the first and second constitutional standing requirements. Moreover, while the Racetracks' requested injunction is of questionable utility in alleviating their injuries, a favorable trial verdict would likely yield quantifiable damages as a remedy for the alleged economic harm. The Racetracks' injuries are thus redressable by a favorable damages award, if not an injunction. Accordingly, the Racetracks have constitutional standing in this case.

NMHA attacks the Racetracks' prudential standing by arguing that the Racetracks impermissibly seek relief on behalf of third-party horsemen's groups. Doc. 44 at 7 (citing Doc. 23 at 14 ¶ 95). NMHA misconstrues the Racetracks' claims. The Racetracks allege that NMHA caused their economic injuries by claiming to be the only IHA horsemen's group in New Mexico, thereby interfering with the Racetracks' ability to negotiate with their own horsemen's groups. *See* Doc. 23 at 14 ¶¶ 95, 97. The Racetracks' counterclaims also contain no requests for relief on behalf of any third party, including the local horsemen's groups formed in the wake of NMHA's ongoing dispute. As relevant entities injured by NMHA's conduct, the Racetracks have prudential standing. *Cf. Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011). NMHA's argument to the contrary is unavailing.

## B.    Standalone Claim for Injunctive Relief

NMHA next argues that the Racetracks "seek to punish NMHA for its constitutionally protected speech," and that the First Amendment precludes the Court from restraining NMHA's communications. Doc. 44 at 8. NMHA specifically cites Count II of the Racetracks' counterclaims, which is a standalone cause of action for injunctive relief. *Id.* (citing Doc. 23 at 10-11 ¶¶ 66-75). In that Count, the Racetracks invoke the IHA and ask the Court "to enjoin NMHA, Jenson, and Alfortish from representing that NMHA is the exclusive horsemen's group in New Mexico and from interfering with simulcasts." Doc. 23 at 11 ¶¶ 74-75. Setting aside NMHA's First Amendment arguments for now,[6] the Court notes that an injunction is a remedy, not a standalone claim. *See Flor v. Bd. of Regents of Univ. of N.M.*, 539 F. Supp. 3d 1176, 1201-02 (D.N.M. 2021) (collecting cases); *Knutson v. Vill. of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019) ("With respect to injunctive relief, that is a remedy, not a cause of action, and thus should not be pleaded as a separate count."). The Racetracks must therefore put forward a cognizable legal basis for injunctive relief.

Count II does not meet that benchmark. Injunctive relief is available under the IHA only if the Racetracks establish that the NMHA Defendants violated its terms. *See* 15 U.S.C. § 3003. The Racetracks have not done so. They do not allege that the NMHA Defendants accepted illegal off-track wagers or otherwise violated the IHA's provisions. Count II avers no other legal basis to issue an injunction. The Court therefore dismisses that counterclaim.

## C.    Antitrust Claims

The Racetracks allege NMHA violated the Sherman Anti-Trust Act by fomenting a group boycott and attempting to monopolize the off-track betting market in New Mexico. *See* Doc. 23 at

---

[6] The Court addresses NMHA's First Amendment arguments in Section II(F), infra.

12 ¶ 86-13 ¶ 87. These allegations implicate statutory prohibitions on joint anticompetitive conduct, 15 U.S.C. § 1, and on attempted monopolization, 15 U.S.C. § 2.[7] NMHA argues that both theories should be dismissed. *See* Doc. 44 at 16-24. The Court agrees.

### 1.    Group Boycott

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade of commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 1. Courts evaluate Section 1 antitrust claims two ways. First, under the rule of reason, which requires analysis of the defendants' market power and allegations establishing the existence of a valid market. *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 186 (10th Cir. 2025). Second, as per se violations, which must be supported by allegations of conspiracy between competitors to engage in, inter alia, a group boycott. *Id.*

In this case, the Racetracks allege a per se violation, stating that NMHA "effectuated a group boycott to limit competition[.]" Doc. 23 at 13 ¶ 87. Under Section 1, group boycotts involve "conspirators whose market position[s] are horizontal to each other and who 'cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete[.]'" *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) (quoting *Nw. Wholesale Stationers v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294 (1985)). Stated differently, "a group boycott can only exist between conspirators who compete at the same market level." *TV Commc'ns*

---

[7] The Racetracks bring concomitant claims under the New Mexico Antitrust Act, NMSA 1978, §§ 57-1-1 and -2 (1987). *See* Doc. 23 at 13 ¶ 92-14 ¶ 98. Because New Mexico's antitrust statutes are construed in accordance with federal antitrust laws, the Court treats the Racetracks' state and federal antitrust claims as coextensive. *See* NMSA 1978, § 57-1-15; *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law.").

*Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1027 (10th Cir. 1992). To avoid dismissal under this standard, the Racetracks must allege that NMHA and its coconspirators are horizontal market competitors. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) ("[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors.").

The Racetracks assert that NMHA led a group boycott by "inducing horseracing associations in other states to withhold simulcasts to New Mexico racetracks[.]" Doc. 23 at 12 ¶ 86. The Racetracks specifically identify the Kentucky HBPA, which allegedly colluded with NMHA to withhold consent for all Kentucky simulcasts to New Mexico. *Id.* at 9 ¶ 60. At least one Kentucky racetrack, Keeneland, withheld its signal from New Mexico due to Kentucky HBPA's boycott with NMHA. *Id.* at ¶¶ 58-59.

These allegations fail to satisfy the standard for an illegal group boycott under the Sherman Act. The Racetracks do not allege that NMHA, the Kentucky HBPA, or other out-of-state horsemen's groups are direct competitors. As pled, NMHA conspired with the Kentucky HBPA to block simulcast signals to New Mexico. While that conduct may create liability under tort theories, it does not yield an actionable antitrust claim because NMHA, the Kentucky HBPA, and other unnamed out-of-state horsemen's groups do not compete at the same market level. *See Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 641 (10th Cir. 1987). Critically, the Racetracks make no allegations that the Kentucky HBPA or any other out-of-state horsemen's group competes for any share of the New Mexico off-track wagering market. This omission is fatal to their Section 1 group boycott claim.[8]

---

[8] In their response, the Racetracks assert *Cloverleaf Enterprises, Inc. v. Maryland Thoroughbred, Horsemen's Association*, 730 F. Supp. 2d 451, 463 (D. Md. 2010) demonstrates that "a horsemen's group that conspires with out-of-state horsemen's groups to withhold consent for simulcast signals

2.    **Monopolization**

The Racetracks also bring a monopolization claim against NMHA under Section 2 of the Sherman Act. Doc. 23 at 12 ¶¶ 85-86. Section 2 provides, in relevant part, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony[.]" 15 U.S.C. § 2. Section 2 monopolization claims have three elements: (1) "possession of monopoly power in the relevant market"; (2) "willful acquisition or maintenance of that power"; and (3) damages caused by the anticompetitive conduct. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1168 (10th Cir. 2023).

The first element requires the claimant to define the relevant market. *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1312 (10th Cir. 2017). This involves an "inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). "The product market consists of products 'found to be sufficiently suitable,' and the geographic market encompasses 'the terrain in which competition takes place.'" *Buccaneer Energy (USA) Inc.*, 846 F.3d at 1312 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013)). To identify a product market, the claimant "must justify any proposed market by defining it 'with reference to

---

and off-track wagering" violates the Sherman Act. Doc. 54 at 12-13. But *Cloverleaf* is distinguishable in one key respect: the illegal boycott alleged in that case was initiated by a Maryland horsemen's group and two Baltimore-area racetracks, both of whom competed in the same market. 730 F. Supp. 2d at 456, 458. While *Cloverleaf* did not expressly analyze whether the racetracks were horizontal competitors, it did conclude that the defendants jointly "asked out-of-state racetracks to stop sending their simulcast signals to [the plaintiff]." *Id.* at 463. Similar allegations are notably absent here.

the rule of reasonable interchangeability and cross-elasticity of demand.'"[9] *Id.* at 1313 (quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008)). Next, "[t]he geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Wetsman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986) (citation modified). Finally, in demonstrating a defendant's market power, the claimant must allege that the defendant had power to either "control prices or . . . exclude competition." *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1176 (10th Cir. 2023) (citation modified). These facets of market power depend on several characteristics, "including . . . market share, barriers to entry, the number of competitors, and market trends." *Id.* Importantly, "[f]ailure to allege a legally sufficient market is cause for dismissal" of a monopolization claim. *Campfield*, 532 F.3d at 1118.

Here, the Racetracks define the relevant market as "the interstate off-track wagering market in New Mexico." Doc. 23 at 12 ¶ 80. This geographic limitation is workable, given that the Racetracks are located in New Mexico and offer off-track horserace wagering under the regulation of the NMRC. *Id.* at 3 ¶¶ 9-14. The Racetracks' identification of the product market, however, is inchoate. While off-track wagering does occur in New Mexico, the Racetracks do not plead facts showing that the market includes competition among horsemen's groups for simulcast consent agreements—the "products" at issue here. For instance, the Racetracks allege that NMHA has falsely asserted itself as the sole New Mexico horsemen's group under the IHA. *Id.* at 7 ¶ 46. They also allege that NMHA "represented to the New Mexico Office of Attorney General that 'it is not

_____

[9] Cross-elasticity and interchangeability are essentially synonymous: high cross-elasticity occurs when "an increase in the price of one product causes consumers to switch to the other, and vice versa" which in turn causes products to be interchangeable within the same market. *Buccaneer Energy (USA) Inc.*, 846 F.3d at 1313.

possible for a New Mexico racetrack to attempt to negotiate with any other horsemen's group.'" *Id.* at 8 ¶ 50. But these allegations lack any reference to the availability of other horsemen's groups, i.e., the other competitors who could provide interchangeable goods or services within the same market.[10] There is no facial indication that the off-track wagering market in New Mexico included other horsemen's groups with whom the Racetracks sought to contract. Lacking any allegations related to cross-elasticity or interchangeability, the Racetracks fail to define the relevant product market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability or cross-elasticity of demand . . . the relevant market is legally insufficient and a motion to dismiss may be granted.").

Moreover, the Racetracks do not delineate NMHA's market power because they state no facts showing NMHA had the ability to set prices or exclude competition. They do not mention the number of competing horsemen's groups, barriers to entry, market trends, or NMHA's market share. *Black*, 69 F.4th at 1176. Rather, their allegations focus entirely on NMHA's statements identifying it as the sole New Mexico horsemen's group. *See* Doc. 23 at 7 ¶ 46-9 ¶ 60. Although the Racetracks assert that NMHA holds itself out as the lone horsemen's group in New Mexico, they do not define NMHA's actual market power—a prerequisite in this context. *Campfield*, 532 F.3d at 1118 (noting that defining the relevant market is "a threshold requirement" for a

---

[10] Given the standard of review for the Joint Motion to Dismiss, the Court will not look beyond the allegations of the Racetracks' counterclaims. But if it were so inclined, the Court would note that the Racetracks have provided evidence that they were, in fact, able to contract with competing horsemen's groups to negotiate and execute simulcast agreements. *See* Doc. 25-1 at 3 ¶ 14; Mot. H'rg. Tr. at 35:23-36:21; 55:11-22.

monopolization claim (citation modified)). Accordingly, the Racetracks' monopolization claim fails as a matter of law.[11]

### D.    Declaratory Judgment

The core issue in this case is whether NMHA is the sole IHA-defined horseman's group in New Mexico. Accordingly, the Racetracks seek declarations under the federal Declaratory Judgment Act that "there is not only one horsemen's group per state," and that "NMHA is not the exclusive 'horsemen's group' under the IHA for the State of New Mexico." Doc. 23 at 10 ¶¶ A, B. NMHA previously sought a contrary judgment when it sued the Racetracks, invoked the IHA's consent provisions, and requested a declaration that the Racetracks "must have a written agreement with [NMHA] before they give their consents to interstate off-track [simulcast] wagering." Doc. 67 at 20 ¶ 1. Now, NMHA urges that the Racetracks' declaratory relief should be denied "[b]ecause they misunderstand the IHA and its application." Doc. 44 at 12. The Court is not persuaded.

The Declaratory Judgment Act states, "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Supreme Court has explained that "the phrase 'case of actual controversy' . . . refers to the types of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007). The ultimate question in declaratory judgment actions is whether the facts as alleged show "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citation modified); *see also Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th

---

[11] Because the Racetracks' antitrust claims fail on their merits, the Court does not reach NMHA's antitrust standing and immunity arguments. *See* Doc. 44 at 20-23.

1307, 1329 (10th Cir. 2022) ("'[F]ederal courts can issue declaratory judgments if there is an actual dispute between adverse litigants and if there is a substantial likelihood that the favorable federal court decision will bring about some change.'" (quoting Erwin Chemerinsky, *Constitutional Law: Principles & Policies* (2011)).

Here, NMHA contends that the Racetracks fail to plead a violation of the IHA and thus do not present an actual case or controversy arising under its terms. Doc. 44 at 13. That is true but not dispositive. While the Racetracks' antitrust claims have been dismissed, their remaining tort claims necessarily turn on whether NMHA is New Mexico's only IHA-defined horsemen's group. Notably, the Racetracks allege that NMHA wrongly and publicly asserted itself as the only statutory horsemen's group in New Mexico and used that purported status to induce other out-of-state horsemen's groups to withhold their consent for races to be simulcast at the Racetracks' facilities. *See* Doc. 23 at 6-9 ¶¶ 36-61. That conduct forms the locus of the Racetracks' state law grievances. Resolution of the remaining dispute turns on whether NMHA rightfully asserted itself as the requisite horsemen's group under the IHA. *See* 15 U.S.C. § 3004(a)(1)(A).

The question of whether NMHA can properly assert itself as the horsemen's group presents a controversy that can be resolved by declaratory relief: the parties are adverse, the dispute is material to NMHA's tort claims, and a declaration settling NMHA's status under the IHA will move the needle towards resolution. *See Atlas Biologicals, Inc.*, 50 F.4th at 1329. Accordingly, the Court denies NMHA's request to dismiss the Racetracks' declaratory judgment counterclaim.

### E.    State Law Claims

The Racetracks' remaining claims invoke New Mexico tort law. First, the Racetracks allege that the NMHA Defendants tortiously and intentionally interfered with existing simulcast contracts. Doc. 23 at 14 ¶ 99-15 ¶ 105. Second, and in the alternative, the Racetracks allege that

the NMHA Defendants are liable for prima facie tort. *Id.* at 15 ¶¶ 106-109. Predictably, the NMHA

Defendants seek to dismiss both claims. Doc. 44 at 24-26.

### 1.    Intentional Interference with Contract

To succeed on their intentional interference claim, the Racetracks must allege: (1) NMHA

Defendants had knowledge of existing contracts; (2) the Racetracks were unable to fulfill their

contractual obligations; (3) NMHA Defendants had "an active and substantial" role in causing the

Racetracks to lose the benefits of the contracts; (4) the Racetracks suffered damages; and (5)

NMHA Defendants "induced the breach without justification or privilege to do so." *Deflon v.

Sawyers*, 2006-NMSC-025, ¶ 16, 139 N.M. 637, 137 P.3d 577.

The NMHA Defendants claim that the Racetracks fail to allege that "any tortious acts

caused them or another racing association to breach an existing contract." Doc. 44 at 25. The

Racetracks, however, do state that NMHA has successfully convinced out-of-state horsemen's

groups to withdraw and withhold consent for simulcasting into New Mexico. Doc. 23 at 8 ¶ 56.

That campaign affected existing simulcast contracts with other racing associations, as those

associations "have indicated that [t]he Racetracks will not be permitted to accept interstate off-

track wagers on races taking place in other states" following the NMHA Defendants' actions. *Id.*

at 14 ¶ 101.  Further, the Racetracks allege that the NMHA Defendants knew about the simulcast

contracts, *id.* at ¶ 100, and waged a public relations campaign aimed specifically at hindering the

Racetracks' simulcasting business. *See id.* at 7 ¶¶ 47-49, 8 ¶¶ 52-56. At least one Kentucky racing

association, Keeneland, responded to that campaign and ceased sending its signal into New

Mexico. *Id.* at 9 ¶ 58. Taken together, these allegations show that the NMHA Defendants knew

about existing simulcast contracts and intentionally sought to disrupt them. The Racetracks' claim

thus withstands scrutiny at this stage.

The NMHA Defendants further argue the IHA preempts state law in the context of horserace regulation and that the Racetracks' interference claim "impedes and frustrates the congressional objectives within the IHA" by penalizing NMHA for "exercising its rights as the 'horsemen's group' under the federal statute." Doc. 44 at 25. Perhaps more simply, the NMHA Defendants assert that their conduct was privileged under the IHA, thereby negating the last element of the Racetracks interference claim. *Id.* This argument lacks merit. Nothing in the IHA immunizes horsemen's groups against state tort liability. Moreover, the NMHA Defendants misunderstand their role: the IHA does not require the Racetracks to obtain NMHA's consent to accept simulcast signals from out-of-state racing associations. By attempting to interfere with that process, NMHA ran afoul of New Mexico's common law prohibition on intentional interference with contract. The IHA does not shield the NMHA Defendants from the consequences of that conduct. The Court denies the NMHA Defendants' request to dismiss this claim.

### 2.    Prima Facie Tort

To prevail on their prima facie tort claim, the Racetracks must show that the NMHA Defendants' conduct satisfies the following elements: "(1) an intentional, lawful act; (2) committed with the intent to injure the plaintiff; (3) causing injury to the plaintiff; and (4) the absence of justification for the injurious act." *Grover v. Stechel*, 2002-NMCA-049, ¶ 19, 132 N.M. 140, 45 P.3d 80.

The NMHA Defendants maintain that the Racetracks' allegations do not establish the requisite intent. *See* Doc. 44 at 26. This argument fails because the Racetracks' counterclaims are replete with intentionally harmful conduct by NMHA, Jenson, and Alfortish. For instance, the Racetracks allege that NMHA publicly and wrongfully asserted itself as the sole horsemen's group in New Mexico and "tried to rally horsemen's groups in other states to withhold their consent to

simulcasting" for the purpose of interfering with the Racetracks' simulcasting. Doc. 23 at 8 ¶ 53. As part of that campaign, NMHA made accusations on social media that any racetrack that refused to contract with NMHA would be in violation of federal law. *Id.* at ¶ 52. Jenson and Alfortish played active roles in this campaign by communicating NMHA's positions to third parties while threatening the Racetracks with financial harm for "continued refusal to negotiate with the NMHA[.]" *Id.* at 7 ¶¶ 48-49.

The Racetracks have satisfied the intent required for a prima facie tort claim. They allege that the NMHA Defendants launched a public campaign that asserted NMHA as the sole horsemen's group in New Mexico, regardless of whether that assertion was true. That campaign, both in public and private, utilized statements demonstrating the NMHA Defendants' intent to harm the Racetracks' ability to import simulcast signals from out-of-state racing associations. Accordingly, the Racetracks have adequately pled the required elements. The Court will not dismiss the prima facie tort claim on these grounds.

### E.   Affirmative Defenses

The NMHA Defendants raise two affirmative defenses which require brief discussion. First, they assert that the Racetracks' proposed injunctive relief is broadly prohibited by the First Amendment under the *Noerr-Pennington* doctrine and as an unconstitutional prior restraint. Doc. 44 at 8-11. The Court has dismissed the Racetracks' standalone injunction claim, along with their antitrust claims. The Racetracks do not request injunctive relief for their state tort claims, *see* Doc. 23 at 14-15, ¶ 99-109, or in conjunction with their declaratory judgment action. *Id.* at 9-10, ¶¶ 62-65. Further, the NMHA Defendants do not identify any First Amendment theories that immunize them from the remaining claims for damages or declaratory relief. Consequently, the NMHA Defendants' First Amendment contentions are moot.

Second, Jenson and Alfortish argue that they are entitled to immunity under the federal Volunteer Protection Act ("VPA"). Doc. 44 at 11-12. The VPA broadly limits the personal liability of volunteers of nonprofit organizations and government entities acting within the scope of their volunteer duties. 42 U.S.C § 14503(a). The VPA expressly preempts state law and provides immunity for state claims. 42 U.S.C. § 14502(a); *see also Armendarez v. Glendale Youth Ctr., Inc.*, 265 F. Supp. 2d 1136, 1140 (D. Ariz. 2003) ("Congress clearly demonstrated an intent for the VPA's liability protection to generally cover both state and federal law[.]"). But that immunity is limited, as the VPA does not apply to harm "caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer[.]" 42 U.SC. § 14503(a)(3).

Jenson and Alfortish insist that the VPA protects them because they serve as "volunteer, uncompensated officers and board members" of NMHA, which is a nonprofit organization. Doc. 44 at 11. In response, the Racetracks argue that it is not apparent that Jenson and Alfortish are volunteers and that their alleged conduct is willful, falling within § 14503(a)(3)'s exclusion. Doc. 54 at 7-8. Based on the facts alleged in the counterclaims, the Racetracks' position is correct. The Racetracks allege Jenson is the president of the NMHA and Alfortish is an NMHA board member. Doc. 23 at 2 ¶¶4-5. The Racetracks make no allegations as to whether Jenson and Alfortish receive compensation for their roles; lacking more, the Court will not infer that they fall within the VPA's statutory definition of "volunteer."[12] 42 U.SC. § 14505(6). Further, the Racetracks allege that

---

[12] Jenson and Alfortish attached tax forms to their reply brief indicating that they received no monetary compensation from NMHA. *See* Doc. 60-1. These forms are not mentioned or adopted by reference anywhere in the Racetracks' counterclaims. Accordingly, the Court will not consider them in deciding NMHA's Motion to Dismiss. *See Prager v. LaFaver*, 180 F.3d 1185, 1188-89 (10th Cir. 1999) (endorsing district courts' wide discretion to decline to consider attachments to a motion to dismiss).

Jenson and Alfortish intentionally carried out a public campaign to harm the Racetracks' economic interests. *See* Doc. 23 at 7 ¶¶ 48-49. That intentional conduct is excluded from VPA protection by § 14503(a)(3). Finally, Jenson and Alfortish argue in their reply brief that the VPA only protects "individuals" from intentional torts like those alleged here, and thus excludes the Racetracks from the intentional conduct exception because they are not "individuals" for purposes of the statute. Doc. 60 at 6. The Court is unpersuaded. The VPA does not define the term "individual." *See* 42 U.S.C § 14505. Lacking clear evidence of congressional intent to the contrary, the Court will not adopt a narrow reading of that term.

In sum, the NMHA Defendants' First Amendment arguments are moot, and Jenson and Alfortish are not entitled to VPA immunity at this stage of litigation. Consequently, the NMHA Defendants' affirmative defenses do not provide grounds to dismiss the surviving counterclaims.

## CONCLUSION

For the foregoing reasons, the Court denies the Racetracks' Motion for Preliminary Injunctive Relief, Doc. 25. The Court grants in part the NMHA Defendants' Joint Motion to Dismiss, Doc. 44, by dismissing Counts II, III, and IV of the Racetracks' counterclaims. Doc. 23 at 10-14, ¶¶ 66-105. The Joint Motion to Dismiss is otherwise denied.

It is so ordered.

UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA