**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

NEW MEXICO HORSEMEN'S ASSOCIATION,
Petitioner/Counter-defendant/Defendant in Intervention,

v. No. 1:24-cv-00235 MLG-DLM

SUNRAY GAMING OF NEW MEXICO, L.L.C.,
dba SUNRAY PARK & CASINO,
Respondent/Counterclaimant/Third-Party Plaintiff,

and

DOWNS AT ALBUQUERQUE, INC., dba
THE DOWNS RACETRACK & CASINO and
ALL-AMERICAN RUIDOSO DOWNS, LLC, dba
RUIDOSO DOWNS RACE TRACK AND CASINO,
Plaintiffs in Intervention/Third-Party Plaintiffs,

v.

DR. PAUL JENSON, DVM, and
SEAN ALFORTISH,
Third-Party Defendants.

**RACETRACKS' MOTION TO DISMISS NMHA'S AMENDED COUNTERCLAIMS [DOCS. 115 AND 116]**

Sunray Gaming of New Mexico, L.L.C. ("Sunray"), Downs at Albuquerque, Inc. dba The Downs Racetrack & Casino ("The Downs"), and All-American Ruidoso Downs, LLC dba Ruidoso Downs Race Track and Casino ("Ruidoso Downs") (collectively, the "Racetracks") move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the New Mexico Horsemen's Association's ("NMHA") Amended Counterclaim asserted against The Downs and Ruidoso Downs in NMHA's First Amended Answer to the Complaint in Intervention [Doc. 115 at 21-48] and the parallel Amended Counterclaim asserted against Sunray in NMHA's First Amended Reply to Sunray's

Counterclaims [Doc. 116 at 21-47] (together, the "Amended Counterclaims").[1] This Motion is directed to the Amended Counterclaims and supersedes the Racetracks' motion to dismiss NMHA's original Counterclaims [Doc. 113], which can be denied as moot in light of the amended pleadings and this renewed Motion. Pursuant to D.N.M.LR-Civ. 7.1(a), the Racetracks previously sought NMHA's position on dismissal of its counterclaims and confirmed that NMHA does not consent.

## INTRODUCTION AND BACKGROUND

In March 2025, the Court dismissed the Interstate Horseracing Act ("IHA") claims in NMHA's First Amended Complaint ("FAC") against all three Racetracks with prejudice. Doc. 92 at 13. The Court held that the horsemen's group is determined track by track and race day by race day, that "it does not matter which group represents horsemen at the state level," *id.* at 6; that the FAC's allegations and the attached stall agreements "establish the existence of alternative, unanimously appointed horsemen's groups at Ruidoso Downs and Albuquerque Downs for all race days," *id.* at 8; that the IHA "creates liability for those individuals who accept interstate off-track wagers, not tracks that simulcast their signals absent consent from the relevant horsemen's group," *id.* at 9-10; that the FAC alleged no facts establishing a regular contractual process between NMHA and the Racetracks, *id.* at 11-12; and that the IHA provides no cause of action to challenge the Racetracks' stall contracts or "a racetrack's choice to exclude certain individuals, including members of a horsemen's group," where NMHA "fail[ed] to state any unlawful reason" for the exclusions. *Id.* at 12-13.

---

[1] Docs. 115 and 116 contain the same Amended Counterclaim with the same paragraph numbers, except where Doc. 116 substitutes allegations specific to Sunray. "Am. Countercl. ¶ __" refers to the Amended Counterclaim in Doc. 115. Doc. 116 is cited separately where it differs.

In October 2026, NMHA asserted the same theories as four "Counterclaims" against the Racetracks and non-party Commissioner Billy Smith, Docs. 109, 110, and moved under Rule 13(h) to join Commissioner Smith. Doc. 111. When the Racetracks moved to dismiss and opposed joinder, Docs. 113, 114, NMHA amended "pursuant to Fed. R. Civ. P. 15(a)(1)(A) and (B)," still without seeking relief from Doc. 92 or leave to amend. Doc. 115 at 1; Doc. 116 at 1. The Amended Counterclaims keep the same four counterclaims. They add allegations that NMHA and each Racetrack negotiated written agreements "[f]or decades before the 2023 racing season" until the Racetracks "abandoned the regular contractual process," Am. Countercl. ¶¶ 21, 23, 35; findings from a 2023 preliminary order in *N.M. Horsemen's Ass'n v. All American Ruidoso Downs, LLC*, No. D-1226-CV-2023-00110 (N.M. 12th Jud. Dist. Ct.); Am. Countercl. ¶¶ 26-27, 32; an allegation, "upon information and belief," that wagers placed in other States on the Racetracks' races are combined in the Racetracks' own pari-mutuel pools, "so that the Tracks themselves accept interstate off-track wagers," *id.* ¶¶ 41, 61, 70(d); and allegations that the Racetracks invoked the New Mexico Racing Commission's (the "Commission") vote to "unrecognize" NMHA. *Id.* ¶¶ 30-33. Counterclaim IV now purports to assert a claim under 42 U.S.C. § 1983 against the Racetracks themselves, on the theory that they "have been willful participants in joint action" with the Commission, and seeks attorney's fees under 42 U.S.C. § 1988. *Id.* ¶¶ 73, 79; Doc. 115 at 44, 48. Against Sunray, NMHA drops the stall-form allegations and alleges instead that Sunray told NMHA members "they had to stop supporting NMHA in order to race there." Doc. 116 at 32-33 ¶ 35.

An amendment as a matter of course allows a party to revise its own pleading. It does not undo an order dismissing claims with prejudice, and it does not cure Doc. 116's use of a counterclaim in reply to revive NMHA's dismissed claims. The new allegations also fail on their

own terms. The Amended Counterclaims still plead the stall and entry form arrangement that the Court held establishes the committees at The Downs and Ruidoso Downs as the horsemen's group, and the 2023 state court order NMHA now invokes was a limited preliminary order concerning a single meet. NMHA's contracting history does not establish its status on later race days, because the "regular contractual process" protected by § 3004(a)(1)(B) is the process between a track and "the applicable horsemen's group." 15 U.S.C. § 3002(21). The IHA treats the off-track betting system, not the host track, as the entity that accepts a wager on the host track's races, and even combining wagers in a common pool does not change that. Sunray's alleged exclusion of NMHA supporters is the exclusion theory the Court already held the IHA does not reach. Counterclaim IV fails because the IHA creates no rights enforceable under § 1983 and, independently, because NMHA does not allege that the State coerced or jointly undertook the ongoing conduct it challenges.

The Amended Counterclaims should be dismissed as against the Racetracks. Alternatively, the Court should decline to entertain the declaratory counterclaims. The Court should also decide this Motion before NMHA's Rule 13(h) motion [Doc. 111]. The chart below shows, for each of the Amended Counterclaims, what the Court has already held about the same request or the same conduct. Except where noted, "Am. Countercl." refers to Doc. 115, and each entry applies to Doc. 116 as well.

| **Counterclaim and requested relief** | **What the Court has already held** |
| --- | --- |
| **Counterclaim I: Declaratory Judgment (Status and Consent)**<br>Am. Countercl. ¶¶ 58-62; Prayers A-B<br>(1) NMHA is the horsemen's group at each Racetrack, and the track committees are not. ¶ 59; Prayer A.<br>(2) Consent obtained through stall and entry forms (Sunray: through exclusion) is not a written agreement in the regular contractual process, and | (1) The horsemen's group is determined track by track and race day by race day; "it does not matter which group represents horsemen at the state level." Doc. 92 at 6. The stall and entry forms "establish the existence of alternative, unanimously appointed horsemen's groups at Ruidoso Downs and Albuquerque Downs for all race days." *Id.* at 8. NMHA's statewide history and 2023 state-court recognition, "without more, do not establish that NMHA represented the majority of owners and trainers at any of the Racetracks on any race day." *Id.* at 7-8. |

| **Counterclaim and requested relief** | **What the Court has already held** |
|---|---|
| the Racetracks may not consent without an agreement with NMHA. ¶ 60; Prayer B.<br>(3) Wagers on the Racetracks' races, including wagers combined in the Racetracks' pari-mutuel pools, are accepted in violation of the IHA. ¶ 61. | (2) The same request as FAC Prayer 1, Doc. 67 at 20 ¶ 1, dismissed with prejudice. Doc. 92 at 8-13; Doc. 106 at 3.<br>(3) The IHA "creates liability for those individuals who accept interstate off-track wagers, not tracks that simulcast their signals absent consent from the relevant horsemen's group," and the off-track betting systems are the parties that "accepted interstate wagers on Ruidoso Downs's simulcasts." Doc. 92 at 9 n.3, 10. NMHA argued pooling at the hearing, Hr'g Tr. 201:7-205:6. |
| **Counterclaim II: Declaratory Judgment (§ 3004(b)(1)(B))**<br>Am. Countercl. ¶¶ 63-66; Prayer C<br>(1) The Racetracks may not accept wagers on imported simulcasts without approval of the closest operating track in an adjoining State, and wagers so accepted violate the IHA. ¶¶ 64-65; Prayer C.<br>(2) Out-of-state horsemen's groups and host racing associations that withhold consent or cancel contracts are "well within their rights." ¶ 65. | The Court rejected NMHA's use of the same theory against the Racetracks' claims, holding their § 3004(b) compliance "ancillary" to claims that "focus on NMHA's conduct, not their own statutory compliance." Doc. 94 at 5-6. NMHA pleads the same theory as its Eleventh-Thirteenth Defenses. Doc. 115 at 18-19. Section 3006(a) authorizes suit by host racing associations and the relevant horsemen's groups, Doc. 92 at 6, and NMHA is neither for out-of-state races. |
| **Counterclaim III: Injunction Under § 3006(a)**<br>Am. Countercl. ¶¶ 67-70; Prayer D<br>Enjoin the Racetracks from:<br>(a) consenting to interstate off-track wagering without an agreement with NMHA;<br>(b) conditioning stalls, entries, or racing on appointment of a track committee (Sunray: excluding horsemen, or conditioning their racing, because of support for NMHA);<br>(c) accepting wagers on imported simulcasts without § 3004(b)(1)(B) approval;<br>(d) accepting wagers on their own races through combined pools without an agreement with NMHA. ¶ 70(a)-(d). | Enforcement under § 3006(a) requires horsemen's-group status. Doc. 92 at 5-8.<br>(a) The same request as FAC Prayer 2, Doc. 67 at 20 ¶ 2, dismissed with prejudice. Doc. 92 at 8-12.<br>(b) The same requests as FAC Prayers 3-4, Doc. 67 at 20-21 ¶¶ 3-4. The FAC also alleged the 2024 exclusion letters and the reason NMHA now attributes to them. Doc. 67 at 9 ¶¶ 32-33; Doc. 92 at 3. The IHA "does not provide a cause of action for parties seeking to challenge third-party contracts" and "provides no statutory basis to challenge a racetrack's choice to exclude certain individuals, including members of a horsemen's group," and NMHA "fail[ed] to state any unlawful reason." Doc. 92 at 12-13.<br>(c) See Counterclaim II.<br>(d) See Counterclaim I(3). |
| **Counterclaim IV: § 1983 and *Ex parte Young***<br>Am. Countercl. ¶¶ 71-79; Prayers E-F<br>Declaration and prospective injunction against the Racetracks' (a) refusal to deal with NMHA, (b) use of track committees, and (c) conditioning of stalls and racing on committee appointment (Sunray: exclusion of horsemen who support NMHA); fees under 42 U.S.C. § 1988. ¶¶ 77, 79. | Pleaded against the Racetracks for the first time, but each practice is one the Court has addressed:<br>(a) NMHA did not plead that it is the horsemen's group at any Racetrack on any race day. Doc. 92 at 6-8.<br>(b) On the facts pleaded, the committees are the horsemen's group. *Id.* at 8.<br>(c) The Court had the allegations that trainers who refuse to sign "are excluded from racing or obtaining stalls" and that NMHA's directors were banned from Sunray and Ruidoso Downs, *id.* at 3, and held that the IHA gives no basis to challenge the stall contracts or "a racetrack's choice to exclude certain individuals, including members of a horsemen's group." *Id.* at 12. |

## LEGAL STANDARD

Under Rule 12(b)(6), the Court accepts well-pleaded factual allegations as true and construes them in the light most favorable to the pleader, but it "need not accept 'a legal conclusion couched as a factual allegation.'" Doc. 92 at 4 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The pleading must state a claim that is "plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The same standard applies to counterclaims. *Santa Fe Goldworks, Inc. v. Bella Jewelry, LLC*, No. 23-cv-602 KK/JMR, 2025 WL 973675, at *2 (D.N.M. Mar. 31, 2025). The Court may consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," as well as "matters of which a court may take judicial notice." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (internal quotation marks omitted). The Amended Counterclaims quote and rely on the 2023 Ruidoso Downs order, Am. Countercl. ¶¶ 26-27, 32, 73, and NMHA itself filed it in this case. Doc. 41-1. A court may also dismiss under Rule 12(b)(6) claims that are "duplicative of other claims in the suit." *Pulte Homes of N.M., Inc. v. Cincinnati Ins. Co.*, No. 1:26-cv-01372-MIS-SCY, 2026 WL 2676758, at *2 (D.N.M. Sept. 11, 2026) (internal quotation marks omitted).

The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Harris v. City Cycle Sales, Inc.*, 112 F.4th 1272, 1278 (10th Cir. 2024) (internal quotation marks omitted). It "applies to all issues previously decided, either explicitly or by necessary implication," and exists so that an adverse resolution does not "become little more than an invitation to take a mulligan." *Id.* at 1278-79 (internal quotation marks omitted). Leave to amend is denied when amendment would be futile, and "[a] proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs.*,

*Inc.*, 175 F.3d 848, 859 (10th Cir. 1999). Declaratory relief is discretionary; the Court considers whether a declaration "would settle the controversy," whether it "would serve a useful purpose in clarifying the legal relations at issue," whether the remedy "is being used merely for the purpose of 'procedural fencing,'" whether it would increase friction between federal and state courts, and "whether there is an alternative remedy which is better or more effective." *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994).

## ARGUMENT

### I. THE AMENDMENT DOES NOT CURE THE PROCEDURAL DEFECTS IN NMHA'S "COUNTERCLAIMS."

#### A. An Amendment As A Matter Of Course Does Not Reinstate Claims Dismissed With Prejudice.

Rule 15(a)(1) permits a party to "amend its pleading once as a matter of course." Fed. R. Civ. P. 15(a)(1). It governs changes to a pleading. It does not give a party a way around an order dismissing its claims with prejudice. A party seeking to re-plead dismissed claims must first obtain relief from the dismissal and then leave to amend. *See Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1185-86 (10th Cir. 1999) (after dismissal, plaintiff must obtain relief from the judgment before amendment is permitted). Rule 15(a)(1) provides neither, and any request for leave to amend must comply with Rule 15(a)(2) and attach the proposed pleading. D.N.M.LR-Civ. 15.1. NMHA has requested neither revision of Doc. 92 nor leave to amend the FAC. It invokes only Rule 15(a)(1). Doc. 115 at 1-2; Doc. 116 at 1.

An amendment as a matter of course does not reach claims already dismissed with prejudice. In *Tandberg*, the court held that a party was entitled to amend its counterclaims once as a matter of course, but that a counterclaim that "essentially repleads claims that were dismissed with prejudice . . . may not be repleaded." *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09cv863, 2009 WL 4067717, at *2 n.2 (E.D. Va. Nov. 23, 2009). The law of the case points the

same way. The doctrine exists so that an adverse ruling does not "become little more than an invitation to take a mulligan," *Harris*, 112 F.4th at 1278-79 (internal quotation marks omitted), and the Court's authority to revise Doc. 92 does not entitle NMHA to a fresh adjudication because it has placed previously dismissed claims in a new pleading. Prayer B and Counterclaims III(a) and III(b) are the clearest example. They ask for the same declaration and injunctions, against the same Racetracks, that the Court dismissed with prejudice. *Compare* Doc. 67 at 20-21 ¶¶ 1-4, *with* Doc. 115 at 47 (Prayer B), *and* Am. Countercl. ¶ 70(a)-(b); *see* Doc. 92 at 5 (describing the FAC's requests). Prayer B seeks the judgment that the FAC sought and that the Court dismissed: one "requiring the Racetracks to obtain a written agreement with the NMHA before consenting to interstate off-track wagering." Doc. 106 at 3. The remaining counterclaims, including Prayer A, rest on issues the Court has already addressed, as the chart above shows, and they fail on the merits for the reasons in Sections II through IV.

If the Court treats the amended pleadings as requests to revisit Doc. 92 and to amend the FAC, it should deny those requests as futile for the same reasons.

**B. Doc. 116 Is Still A Counterclaim In Reply.**

Amendment does not change the nature of the pleading in Doc. 116. NMHA is the plaintiff against Sunray, and its Amended Counterclaim against Sunray appears in its First Amended Reply (Answer) to Sunray's Counterclaim. Doc. 116 at 1, 21. Rule 7(a)(3) authorizes an answer to a counterclaim, but the Rules do not authorize a counterclaim in reply. Fed. R. Civ. P. 7(a). This District has struck such a pleading, explaining that it "remains an open question in the Tenth Circuit" whether counterclaims in reply are even authorized and that a motion under Rule 15(a)(2) is "a more orthodox—and explicitly authorized—procedural vehicle for asserting a new claim." *R&M Gov't Servs., Inc. v. Kaman Aerospace Corp.*, No. 2:24-cv-524 GJF/JHR, 2025 WL 1079023, at *3-4 (D.N.M. Apr. 10, 2025) (striking counterclaim in reply and construing it as a

motion to amend); *see Turner & Boisseau, Chartered v. Nationwide Mut. Ins. Co.*, 175 F.R.D. 686, 687 (D. Kan. 1997). NMHA's complaint against Sunray was dismissed with prejudice, Doc. 92 at 13, and NMHA cannot use an amended answer to Sunray's counterclaims to bypass that dismissal. The Court should dismiss the Amended Counterclaim in Doc. 116 as against Sunray or, as in *R&M*, treat it as a motion to amend and deny it as futile for the reasons that follow.[2]

## II. COUNTERCLAIMS I AND III(a), (b), AND (d) FAIL ON THE MERITS.

### A. The Downs And Ruidoso Downs: The Amended Counterclaims Still Plead The Arrangement The Court Held Makes The Committees The Horsemen's Group.

The Amended Counterclaims allege that The Downs and Ruidoso Downs each treat a committee as the horsemen's group; that the committees act for owners through the trainers who sign the Racetracks' stall applications and race-entry forms; and that "[a] trainer or owner who declined to sign was not permitted to bring horses onto the Tracks' premises or to stable or enter horses to race at the Tracks." Am. Countercl. ¶¶ 37-38. That is the arrangement the Court addressed in Doc. 92, where it held that the FAC's allegations and the forms "establish the existence of alternative, unanimously appointed horsemen's groups at Ruidoso Downs and Albuquerque Downs for all race days." Doc. 92 at 8. The Amended Counterclaims do not allege that the forms have changed, that any trainer has raced at either track without signing one, or that the committees no longer exist.

NMHA's new allegations about its own organization do not change that holding. NMHA alleges that its members elect "Track Committees" at each track and that it represents the majority

---

[2] Treating either amended pleading as a motion for leave to amend would not change the result. Leave is properly denied for "repeated failure to cure deficiencies by amendments previously allowed" and for "futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). NMHA has now pleaded its IHA theories against the Racetracks in its First Amended Complaint, in its original Counterclaims, and in the Amended Counterclaims, Doc. 67; Docs. 109, 110; Docs. 115, 116, and the Amended Counterclaims are futile for the reasons that follow. *Jefferson Cnty.*, 175 F.3d at 859.

of owners and trainers "on each racing day." Am. Countercl. ¶¶ 20, 29. The Racetracks dispute those allegations, but even accepting the factual allegations about NMHA's elections and membership does not change the outcome. On the appointment allegations before it, the Court held that the appointed group "is the horsemen's group under the IHA, not a rival entity with statewide majority representation." Doc. 92 at 8. NMHA's new race-day allegation does not explain how its elections or membership displace the express appointments that the amended pleading still alleges. Am. Countercl. ¶¶ 20, 29, 37-38. NMHA's objection that the forms bind owners only through their trainers, Am. Countercl. ¶¶ 37-38, was in the FAC too, Doc. 67 at 13-15 ¶¶ 48-49, and the Court had it before it when it held that the committees are unanimously appointed "for all race days." Doc. 92 at 8.

The 2023 state court order NMHA now invokes does not change the analysis. NMHA relies on the order's findings that it represented a majority of the horsemen at the 2023 Ruidoso Downs meet and that the Commission's non-recognition of NMHA is "not relevant" under the IHA. Am. Countercl. ¶¶ 26-27, 32. The Court has already held that the 2023 state court recognition and other statewide allegations "do not establish that NMHA represented the majority of owners and trainers at any of the Racetracks on any race day." Doc. 92 at 7-8. The state court made its findings in awarding "preliminary injunctive relief" in a different case, Doc. 41-1 at 6, and findings made in granting a preliminary injunction "are not binding at trial on the merits" even in the case in which they are made. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). NMHA also relies on some of the order's findings while disregarding others. The same order found that the consents Ruidoso Downs obtained from its committee "satisfy the requirements of the IHA" for the 2023 meet and left the simulcast agreements based on them "in full force and effect." Doc. 41-1 at 4 ¶ 7, 7. The

order was a "limited" preliminary order entered to preserve NMHA's standing in a dispute over purse distributions, *id.* at 2, 6-7, and it made no finding about any race day after the 2023 meet.

**B. The Contracting History Does Not State A Claim Under § 3004(a)(1)(B).**

NMHA's principal addition is its allegation that, before 2023, it and each Racetrack negotiated a series of written agreements, and that the Racetracks then "abandoned" that process. Am. Countercl. ¶¶ 21, 23, 28, 35. The Racetracks dispute those allegations as well. But even accepted as true, they do not state a claim, for three reasons.

First, the regular contractual process is a process with the horsemen's group, but it does not establish who the horsemen's group is. The IHA defines the "regular contractual process" as "those negotiations by which the applicable horsemen's group and host racing association reach agreements on issues regarding the conduct of horseracing by the horsemen's group at that racing association." 15 U.S.C. § 3002(21). Which group is "applicable" is answered by § 3002(12): the group that represents the majority of owners and trainers racing at the track "for the races subject to the interstate off-track wager on any racing day." *Id.* § 3002(12). The Court has held that the inquiry is "which group represents the majority of owners and trainers at a track on a race day." Doc. 92 at 6. And the Court has described § 3004(a)(1)(B) as protecting "[t]he consent of the horsemen's group" from being withdrawn or varied outside the regular contractual process. Doc. 92 at 8-9. NMHA alleges that its agreements expired. Am. Countercl. ¶¶ 23, 28. That history does not establish that NMHA retained the statutory consent right after the appointments alleged in paragraphs 37-38. NMHA's elections and race-day membership allegations must be considered alongside those appointments, which the Court held establish the committees' status under the IHA. Am. Countercl. ¶¶ 20, 29, 37-38; Doc. 92 at 8.

Second, § 3004(a)(1)(B) does not support NMHA's reading. NMHA alleges that, because it had agreements with the Racetracks, the IHA required that, "upon their expiration, NMHA's

written agreement remain a condition precedent to each Track's consent." Am. Countercl. ¶ 28. That language tracks the third sentence of § 3004(a)(1)(B), which provides that "upon the expiration of such then-existing contract the written agreement of such horsemen's group shall thereafter be required as such condition precedent." 15 U.S.C. § 3004(a)(1)(B). But that sentence applies only "[w]here written consents exist at the time of enactment of this chapter between an off-track betting system and the host racing association providing for interstate off-track wagers, or such written consents are executed by these parties prior to the expiration of such then-existing contract," *id.*, meaning a horsemen's contract that existed when the IHA was enacted in 1978. Pub. L. No. 95-515, 92 Stat. 1811 (1978). NMHA alleges that the New Mexico Legislature authorized interstate simulcasting of New Mexico races in 1991, and that simulcasting became a subject of NMHA's agreements "from that time forward." Am. Countercl. ¶ 22. It does not allege that any written consent to interstate off-track wagering existed at the IHA's enactment.

The sentence that *could* apply is the last one: "Where no such written consent exists, and where such written agreement occurs at a racing association which has a regular contractual process with such horsemen's group, said agreement by the horsemen's group may not be withdrawn or varied except in the regular contractual process." 15 U.S.C. § 3004(a)(1)(B). It protects the agreement of "such horsemen's group," meaning the applicable horsemen's group under § 3002(12) and (21), from being withdrawn or varied outside that process. The Court's summary of the provision is to the same effect: where a racing association "and the horsemen's group have engaged in a 'regular contractual process,' the parties must adhere to that process in negotiating the required consent agreement." Doc. 92 at 4-5. Nothing in the provision makes a group that once held that status the horsemen's group on later race days, regardless of whom the owners and trainers racing there have since appointed. NMHA alleges that the Racetracks

"withdrew from and varied the regular contractual process" when they adopted the stall and entry forms. Am. Countercl. ¶ 35. But on the facts pleaded, those forms are how the owners and trainers racing at The Downs and Ruidoso Downs appointed their representative. Am. Countercl. ¶¶ 37-38; Doc. 92 at 8. NMHA contends that the appointment conditions unlawfully displaced its established contractual relationship. But Doc. 92 addressed the same appointment mechanism, and the added contracting history does not supply an IHA cause of action to invalidate those third-party agreements. Doc. 92 at 8, 12. NMHA must still establish why it, rather than the appointed committee, holds the statutory consent right. That is a question of status under § 3002(12), and the Amended Counterclaims do not answer it in NMHA's favor. *See* Section II(A).

Third, the relief NMHA seeks is relief the Court has held the IHA does not provide. Counterclaim III(a) would enjoin the Racetracks from consenting to interstate off-track wagering without an agreement with NMHA, and Counterclaim III(b) would enjoin them from conditioning stalls and entries on committee appointments. Am. Countercl. ¶ 70(a)-(b). The Court has held that the IHA "does not provide a cause of action for parties seeking to challenge third-party contracts," that NMHA "lacks standing to bring a contractual challenge" to the stall agreements, and that the IHA "creates liability for those individuals who accept interstate off-track wagers, not tracks that simulcast their signals absent consent from the relevant horsemen's group." Doc. 92 at 9-10, 12. Section 3006(a) authorizes an injunction "to restrain violations" of the IHA. 15 U.S.C. § 3006(a). Those acts alone do not establish an actionable IHA violation under Doc. 92, and the added contracting history does not supply one for Counterclaim III(a) or (b) to restrain.

**C. Combining Pools Does Not Make The Racetracks The Acceptors Of Wagers On Their Own Races.**

NMHA's answer to Doc. 92's acceptance holding is an allegation (tellingly made "upon information and belief") that wagers placed in other States on the Racetracks' races are combined

into the Racetracks' pari-mutuel pools, "so that the Tracks themselves accept interstate off-track wagers on their own races." Am. Countercl. ¶ 41. NMHA already argued this theory at the preliminary-injunction hearing, Hr'g Tr. 201:7-205:6 (Nov. 22, 2024), but the FAC did not plead it, and the Court did not reach it; Doc. 92 rested on the FAC's failure to allege that any Racetrack accepted an interstate off-track wager. Doc. 92 at 9-10. The question is therefore one of statutory text, and it concerns only wagers placed in other States on the Racetracks' own races, for which each Racetrack is the host racing association. Am. Countercl. ¶ 7. Wagers the Racetracks accept on races run elsewhere are a separate matter. *See id.*

An interstate off-track wager "may be accepted by an off-track betting system only if consent is obtained from" the host racing association, the host racing commission, and the off-track racing commission. 15 U.S.C. § 3004(a). An "off-track betting system" is a group "in the business of accepting wagers on horseraces at locations other than the place where the horserace is run." *Id.* § 3002(7). The "host racing association" is the person that "conducts the horserace subject to the interstate wager." *Id.* § 3002(9). NMHA pleads that each Racetrack is the host racing association for the races it conducts. Am. Countercl. ¶ 7. In the IHA's scheme, the host racing association consents and the off-track betting system accepts. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 636 (6th Cir. 2025) (an off-track betting system "may accept interstate wagers, provided they obtain consents from three entities," beginning with the host racing association); *New England Horsemen's Benevolent & Protective Ass'n v. Mass. Thoroughbred Horsemen's Ass'n*, 210 F. Supp. 3d 270, 276 (D. Mass. 2016) (host track's agreement with horsemen's group is relevant "only . . . insofar as it is a precondition for the horseracing association's ability to consent to an off-track betting system's acceptance of interstate off-track wagers"). Section 3005 confirms that the acceptor and the host track are

different parties: "[a]ny person accepting any interstate off-track wager in violation of this chapter shall be civilly liable for damages to the host State, the host racing association and the horsemen's group." 15 U.S.C. § 3005. On NMHA's reading, a host track that pooled wagers without the required consent would be liable for damages to itself.

The reference in § 3002(3) to "the combination of any pari-mutuel wagering pools" does not change this. That language defines what counts as an interstate off-track wager, 15 U.S.C. § 3002(3); who accepts the wager is governed by § 3004(a) and § 3002(7). Congress added the combined-pools language in 2000, in the same clause that describes the wager as "accepted by an off-track betting system in the same or another State." Pub. L. No. 106-553, § 1(a)(2) [tit. VI, § 629], 114 Stat. 2762, 2762A-108 (2000); 15 U.S.C. § 3002(3). NMHA relies on the Sixth Circuit's statement that, "[b]ecause off-track wagers are placed in the host racetrack's pari-mutuel pool," the host track "accepted an interstate off-track wager for purposes of the Act." *Ky. Div., Horsemen's Benevolent & Protective Ass'n v. Turfway Park Racing Ass'n*, 20 F.3d 1406, 1417 (6th Cir. 1994); *see* Am. Countercl. ¶ 41. That ruling came in a brief jurisdictional analysis, six years before the 2000 amendment, and never attempted to reconcile its conclusion with the distinct roles Sections 3004(a) and 3002(7) assign to the host racing association and the off-track betting system.[3] The 2000 amendment expressly includes combined pools in the wager definition while retaining acceptance by an off-track betting system; it does not say that operating the host pool makes the host track an acceptor. This Court has noted that *Turfway* offers only "one permissible interpretation" of a statute whose language is "imprecise and subject to interpretation," and it declined to treat *Turfway*'s reading of the regular contractual process language as "definitive or

[3] *Turfway*'s holding sentence carries a single footnote, which describes how Kentucky law "statutorily apportions wagers received by an out-of-state off-track betting facility" between the host track, the betting facility, and their purse programs. *Turfway*, 20 F.3d at 1417 n.16. The opinion does not address § 3004(a), § 3002(7), or § 3005's allocation of damages to the host racing association.

controlling." Doc. 92 at 10-11 (quoting *Turfway*, 20 F.3d at 1413). The acceptance ruling in *Turfway* is not controlling, and it should not override the roles the statute assigns.

Finally, paragraph 41 is pleaded only "upon information and belief." Beyond the alleged combination of pools, it identifies no act by which a Racetrack itself accepted a wager placed in another State, and no race, out-of-state betting system, or wager that would establish acceptance on any other basis. Am. Countercl. ¶ 41. An allegation that a defendant accepts interstate wagers, without facts about the circumstances of the wagers, does not state an IHA claim. *L.A. Turf Club Inc. v. US Racing*, No. 2:21-cv-08303-FWS-DTB, 2024 WL 5423013, at *5 (C.D. Cal. Oct. 18, 2024). Counterclaim III(d), which would enjoin the Racetracks from accepting wagers "through the combination of pari-mutuel pools or otherwise," Am. Countercl. ¶ 70(d), and the declaration in paragraph 61 fail with it.

### D. Sunray: The Exclusion Theory Is The One The Court Already Rejected.

Doc. 116 no longer alleges that Sunray uses stall or entry forms. It alleges instead that Sunray told NMHA members "they had to stop supporting NMHA in order to race there," and that "[a] 'majority' manufactured by excluding the horsemen who chose NMHA is not the majority that § 3002(12) describes." Doc. 116 at 32-34 ¶¶ 35, 38. It asks the Court to enjoin Sunray from "excluding owners or trainers from racing at its track . . . because of their support for NMHA." *Id.* at 43 ¶ 70(b).

The Court has already held that "the IHA provides no statutory basis to challenge a racetrack's choice to exclude certain individuals, including members of a horsemen's group," and that New Mexico law gives the Racetracks "statutory, administrative, and common-law rights to exclude any person from their facilities for any lawful reason." Doc. 92 at 12. The FAC sought access to the Racetracks for NMHA's members, Doc. 67 at 21 ¶ 4, and the Court dismissed that claim with prejudice because NMHA "fail[ed] to state any unlawful reason" for the exclusions it

challenged. Doc. 92 at 12-13. Counterclaim III(b) against Sunray seeks the same relief under a different label. The FAC already challenged Sunray's 2024 exclusion letters. It alleged that Sunray and Ruidoso Downs had "banished in writing all state board directors" of NMHA, attaching examples of the letters, and that they had done so if NMHA's directors and members sought "to enforce the provisions of the IHA" or insisted on "a written interstate off-track wagering [simulcasting] agreement." Doc. 67 at 9 ¶¶ 32-33; Docs. 67-4, 67-5. The Court addressed those allegations, Doc. 92 at 3, and held that NMHA "fail[ed] to state any unlawful reason." *Id.* at 12-13. Doc. 116's allegation that Sunray excluded horsemen because of their support for NMHA restates the reason the FAC already alleged, and NMHA still identifies no law that makes exclusion for that reason unlawful. The IHA supplies none, Doc. 92 at 12, and the separate § 1983 theory fails for the reasons in Section IV. The statutory theory also fails on its own terms. Section 3002(12) counts the owners and trainers "racing there." 15 U.S.C. § 3002(12). That definition does not itself confer a right to race at Sunray or limit the exclusion authority the Court recognized in Doc. 92. And NMHA's remaining allegations about the Sunray committee are pleaded upon information and belief and do not identify any committee member, race day, or wager. Doc. 116 at 33 ¶ 37.

**E. NMHA Still Cannot Invoke § 3006(a).**

Section 3006(a) authorizes "the horsemen's group" to sue. 15 U.S.C. § 3006(a). Because NMHA's allegations do not establish the statutory consent right, for the reasons in Sections II(A) and II(D), NMHA has no cause of action under § 3006(a), and Counterclaim III fails on that ground alone. Doc. 92 at 5-8. Counterclaim III is also pleaded as a counterclaim for injunctive relief, and "an injunction is a remedy, not a standalone claim." Doc. 93 at 12. It therefore depends on NMHA's status and on the substantive theories addressed above.

## III. COUNTERCLAIMS II AND III(c) SEEK RELIEF CONCERNING THE RACETRACKS' OBLIGATIONS TO OUT-OF-STATE TRACKS, WHICH NMHA HAS NO STATUTORY BASIS TO REQUEST.

Counterclaim II asks the Court to declare that the Racetracks may not accept interstate off-track wagers on imported simulcasts without approval from "the closest currently operating track in an adjoining State" under § 3004(b)(1)(B), and Counterclaim III(c) seeks an injunction on the same theory. Am. Countercl. ¶¶ 63-66, 70(c). The amendment changed only the description of which out-of-state tracks are involved. Am. Countercl. ¶ 43. The Racetracks do not ask the Court to decide in this Motion whether they have complied with § 3004(b), which the Court declined to construe in Doc. 94. Doc. 94 at 3 n.4. These counterclaims fail for reasons that do not depend on that question.

First, the declaration would serve no useful purpose. *Mhoon*, 31 F.3d at 983. Counterclaim II seeks a declaration that the Racetracks may not accept wagers on imported simulcasts without the approval of Turf Paradise or other out-of-state tracks, none of which is a party or has asserted that its approval was required. NMHA's purpose is defensive: it alleges that out-of-state groups that withhold consent "are well within their rights," Am. Countercl. ¶ 65, and it pleads the same theory as its Eleventh, Twelfth, and Thirteenth Defenses. Doc. 115 at 18-19. NMHA has already placed the § 3004(b)(1)(B) question before the Court as a defense to the Racetracks' tort claims, and its counterclaim identifies no independent statutory right of NMHA that a declaration would protect. The Court has held that the Racetracks' tort claims "focus on NMHA's conduct, not their own statutory compliance," Doc. 94 at 6, and that their § 3004(b) compliance is "ancillary" to those claims. *Id.* at 5. That distinguishes Counterclaim II from the Racetracks' declaratory Count I, which the Court sustained because the tort claims "necessarily turn on" NMHA's status. Doc. 93 at 19. A declaratory counterclaim that restates a defense serves no independent purpose. *See Santa Fe Goldworks*, 2025 WL 973675, at *3 (a "mirror image" counterclaim "is generally the

exact opposite of the original claim with no added nuances" (internal quotation marks omitted)); *id.* at *11 (dismissing declaratory counterclaim that sought, in substance, a ruling on an affirmative defense).[4]

Second, NMHA has no statutory basis to seek this relief under § 3006(a). The IHA's civil-action provision is limited to three plaintiffs: "[t]he host State, the host racing association, or the horsemen's group." 15 U.S.C. § 3006(a). The horsemen's group, in particular, is defined by reference to the host racing association where the race is run. *Id.* § 3002(12). Had NMHA established itself as the horsemen's group for Ruidoso Downs, "it could have brought actionable IHA claims against the off-track betting systems that accepted interstate wagers on Ruidoso Downs's simulcasts." Doc. 92 at 9 n.3. Counterclaim II concerns wagers the Racetracks accept on races run at Turf Paradise and other out-of-state tracks. Am. Countercl. ¶¶ 42-43. As to those races, NMHA is not the host State, is not a host racing association, and does not claim to be the horsemen's group. Section 3004(b)(1) is written for the protection of nearby operating tracks, which may give or withhold approval. 15 U.S.C. § 3004(b)(1)(A)-(B). NMHA's own description is that Congress included the approval requirement "to protect live-racing and the horsemen participating in live-racing at tracks currently accepting parimutuel wagers on their races," Am. Countercl. ¶ 64, which describes the horsemen at the adjoining-state track, not NMHA. NMHA's account of *Sterling Suffolk* is that Congress "supplied other parties with a potential defense should they cancel contracts with the offending facility." Am. Countercl. ¶ 15 (quoting *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n*, 989 F.2d 1266, 1271 (1st Cir. 1993)). A

---

[4] The Racetracks acknowledge that courts in this District decline to dismiss a declaratory counterclaim as redundant when it "asserts an independent case or controversy which would remain viable after a dismissal of the plaintiff's claim." *Pulte Homes*, 2026 WL 2676758, at *2 (internal quotation marks omitted). Counterclaim II does not meet that description. If the Racetracks' claims were dismissed, NMHA would have no § 3006(a) basis to pursue a declaration about the Racetracks' import wagering, and the adjoining-state tracks whose approval § 3004(b)(1)(B) describes would be no more before the Court than they are now.

defense that belongs to the parties who cancel contracts gives NMHA no claim of its own. Counterclaim III(c), which seeks an injunction under § 3006(a) to enforce § 3004(b)(1)(B), Am. Countercl. ¶ 70(c), fails for that reason alone.

## IV. COUNTERCLAIM IV FAILS AGAINST EVERY DEFENDANT.

Counterclaim IV now names the Racetracks as well as Commissioner Smith and seeks fees under § 1988 against both. Doc. 115 at 44, 48; Am. Countercl. ¶¶ 71-79. The counterclaim fails as to each defendant.

### A. The IHA Does Not Create Rights Enforceable Under § 1983 Or In Equity.

Section 1983 supplies a cause of action only where a statute "clear[ly] and unambiguous[ly]" uses "rights-creating terms" and displays "an unmistakable focus" on individuals like the plaintiff. *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 290 (2002)); *Timken v. S. Denver Cardiology Assocs., P.C.*, 155 F.4th 1227, 1233 (10th Cir. 2025). The IHA's operative provisions govern consents and who may accept a wager. 15 U.S.C. §§ 3003-3004. None of the "rights, privileges, and immunities" NMHA lists, Am. Countercl. ¶ 75, is conferred in rights-creating terms. And even a statute that confers rights does not support a § 1983 action "if Congress has displaced § 1983's general cause of action with a more specific remedy." *Medina*, 606 U.S. at 368 (citing *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)); *Timken*, 155 F.4th at 1233, 1236.

The IHA supplies a specific remedy: it identifies the parties who may sue, authorizes injunctions against violations, and ties damages to § 3005's takeout-based measure. 15 U.S.C. §§ 3005, 3006(a). Allowing § 1983 claims by parties outside § 3006(a), for practices the IHA does not make actionable, would bypass those limits and add a fee remedy Congress chose not to include in the IHA. "The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983."

*Rancho Palos Verdes*, 544 U.S. at 121. An equitable action under *Ex parte Young* likewise cannot bypass a statutory remedial scheme Congress intended to be exclusive. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015). And *Ex parte Young* is a remedy against government officers, not private parties; it rests on the equitable power to enjoin "unconstitutional actions by state and federal officers." *Id.* at 327. Against the Racetracks, Counterclaim IV must rest on § 1983 alone. NMHA cannot use § 1983 or equity to obtain, against the Racetracks or Commissioner Smith, the remedy that § 3006(a) reserves to the horsemen's group, a status NMHA has not established. Doc. 92 at 5-8.

Doc. 92's statutory reasoning also supports dismissal of Counterclaim IV. Whether a statute supports a § 1983 action begins with the same inquiry as whether it supports an implied private right of action: "determining whether a statute confers any right at all." *Gonzaga*, 536 U.S. at 285. It is "rights, not the broader or vaguer 'benefits' or 'interests,'" that § 1983 enforces. *Id.* at 283. Counterclaim IV challenges the Racetracks' conditioning of stalls and racing on committee appointments and, as to Sunray, its exclusion of horsemen who support NMHA. Am. Countercl. ¶ 77(c); Doc. 116 at 45 ¶ 77(c). The Court has already noted that the IHA "does not provide a cause of action for parties seeking to challenge" the stall contracts and "provides no statutory basis to challenge a racetrack's choice to exclude certain individuals, including members of a horsemen's group." Doc. 92 at 12. It did so on allegations that trainers who refused to sign "are excluded from racing or obtaining stalls." *Id.* at 3. NMHA identifies no IHA provision conferring a right to race at a particular track or to invalidate another party's stall agreement, and § 1983 supplies no substantive right of its own. The rest of Counterclaim IV depends on NMHA's status as the horsemen's group and on the invalidity of the committees, Am. Countercl. ¶ 77(a)-(b), questions

the Court previously resolved against NMHA in Doc. 92 that the amended allegations do not reopen, for the reasons in Section II. Doc. 92 at 6-8.

To the extent NMHA seeks to enforce its members' asserted rights to choose a representative or to race at a particular track, those rights would belong to the owners and trainers, not to NMHA, and NMHA must establish associational standing. NMHA pleads that "the majority of the owners and trainers racing at a racetrack on any racing day are entitled to be represented by the horsemen's group of their choice," Am. Countercl. ¶ 75, and the exclusion Doc. 116 alleges was directed at "owners and trainers who were members of NMHA." Doc. 116 at 32 ¶ 35. A party generally must assert its own rights, not those of third parties. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). An association may sue on its members' behalf only when, among other things, "its members would otherwise have standing to sue in their own right" and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Whether a particular horseman was excluded for an unlawful reason, rather than for any of the innumerable lawful reasons New Mexico law permits, Doc. 92 at 12, turns on that horseman's own conduct and circumstances, and a claim of that kind would require his/her participation. And NMHA's "members" are deemed members unless they opt out. Doc. 92 at 2 n.1.

### B. NMHA Does Not Allege State Action By The Racetracks.

Section IV(A) disposes of Counterclaim IV against every defendant. Counterclaim IV also fails against the Racetracks for an independent reason. Even if the IHA created a right enforceable under § 1983, the statute reaches only conduct "fairly attributable to the State." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). NMHA relies on joint action. Am. Countercl. ¶ 73. A private party acts under color of state law on that theory only if it is a "willful participant in joint action with

the State or its agents." *Gallagher*, 49 F.3d at 1453 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). The question is "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* The public and private actors must "share a common, unconstitutional goal," or there must be "a substantial degree of cooperative action" or "overt and significant state participation" in the deprivation. *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1157 (10th Cir. 2016) (internal quotation marks omitted) (quoting *Gallagher*, 49 F.3d at 1454). "[T]he mere acquiescence of a state official in the actions of a private party is not sufficient." *Gallagher*, 49 F.3d at 1453. "Action taken by private entities with the mere approval or acquiescence of the State is not state action." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999); *Wittner v. Banner Health*, 720 F.3d 770, 777 (10th Cir. 2013) (joint-action test not met where plaintiffs' theory was one of acquiescence). Government regulation, standing alone, does not supply the connection. *Gallagher*, 49 F.3d at 1448. And where joint action rests on an agreement, "mere conclusory allegations with no supporting factual averments are insufficient"; the pleading must allege "facts tending to show agreement and concerted action." *Beedle v. Wilson*, 422 F.3d 1059, 1073 (10th Cir. 2005) (quoting *Sooner Prods. Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983)); *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). A private party may also become a state actor where the State "exercises sufficient 'coercive power' over the challenged action." *Wittner*, 720 F.3d at 775. But private parties are "not transformed into state actors simply because they had acted in ways the law allowed them to." *Id.* at 775-76.

NMHA's allegations do not meet the standard. Its theory is that the Racetracks "invoked the Commission's purported non-recognition of NMHA" in refusing to negotiate with it and "relied on the Commission's approval" of their committees to obtain the Commission's consents. Am. Countercl. ¶¶ 33, 73-74. But reliance on regulatory approval, without more, is precisely the

kind of “approval or acquiescence” that does *not* establish state action. *Sullivan*, 526 U.S. at 52; *Wittner*, 720 F.3d at 777. The allegation that the Racetracks coordinated with Commissioner Smith’s Arizona statement is made upon information and belief and alleges no actual meeting, communication, or agreement. Am. Countercl. ¶¶ 48, 73. The only allegation that the Commission directed a Racetrack’s conduct concerns Ruidoso Downs’s 2023 meet: the state court found that Ruidoso Downs had not contracted with NMHA because it was “directed not to” by the Commission. Am. Countercl. ¶¶ 32, 73; Doc. 41-1 at 6 ¶ 17. As to The Downs, NMHA alleges direction only “upon information and belief,” on the theory that “the Downs did the same.” Am. Countercl. ¶ 73.

Such allegations do not make the Racetracks state actors in the conduct NMHA is now challenging. The nexus test asks whether the State coerced “the challenged action.” *Wittner*, 720 F.3d at 775. Counterclaim IV seeks only prospective relief against the Racetracks’ current refusal to deal, their committees, and their stall and entry conditions, Am. Countercl. ¶¶ 77, 79, but it identifies no current directive requiring those practices and no facts showing joint implementation beyond the non-recognition decision and the Commission’s regulatory consents. Am. Countercl. ¶¶ 73-74, 77. Repeating that the practices are intertwined does not identify the Commission’s participation in any particular ongoing deprivation. *Beedle*, 422 F.3d at 1073. Those practices are decisions the Racetracks make under rights that state law gives them, Doc. 92 at 12, and acting “in ways the law allowed” is not state action. *Wittner*, 720 F.3d at 775-76. A 2023 directive concerning one meet at one track does not convert the Racetracks’ present business decisions into state action. Doc. 116 pleads the same theory against Sunray with even less: it alleges “upon information and belief” that Sunray, “like Ruidoso, refused to contract with NMHA in keeping with the Commission’s prohibition.” Doc. 116 at 43-44 ¶ 73.

### C. The Arizona Allegations Still State No Claim.

Counterclaim IV's claim against the Racetracks also rests on Commissioner Smith's alleged statement to Arizona horsemen. Am. Countercl. ¶¶ 47-48, 73. The added detail that the statement was made in "the winter or spring of 2024" and was "never withdrawn or retracted," Am. Countercl. ¶¶ 47, 52, does not cure the problems the Racetracks identified in Doc. 114 at 11-12. NMHA still identifies no IHA provision that the statement violates. It relies on the consent right that the IHA "gives the sending-side horsemen's group," Am. Countercl. ¶ 51, which belongs to the Arizona horsemen, not NMHA. *Kowalski*, 543 U.S. at 129. NMHA alleges no facts connecting a Racetrack to the statement beyond the conclusory assertion of coordination addressed in Section IV(B). Am. Countercl. ¶¶ 48, 73. Nor does NMHA allege that any horseman was denied a license or an entry because of the statement, or that the Arizona group changed its position. Am. Countercl. ¶¶ 46-53.

### D. The § 1988 Request Falls With Counterclaim IV.

Fees under § 1988 follow liability on the merits: "liability on the merits and responsibility for fees go hand in hand." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Because Counterclaim IV fails, so does NMHA's request for fees under 42 U.S.C. § 1988 against the Racetracks. Am. Countercl. ¶ 79; Doc. 115 at 48 (Prayer F).

## V. IN THE ALTERNATIVE, THE COURT SHOULD DISMISS DUPLICATIVE CLAIMS AND DECLINE TO ENTERTAIN THE DECLARATORY COUNTERCLAIMS.

"Duplicative claims may be dismissed pursuant to Rule 12(b)(6) . . . for the sake of judicial efficiency." *Reserve Indus. Corp. v. Roll Em Up Franchise Grp., LLC*, No. 24-1074 GBW/JMR, 2025 WL 3296162, at *13 (D.N.M. Nov. 26, 2025) (internal quotation marks omitted) (dismissing duplicative counterclaim). Prayer B and Counterclaims III(a) and III(b) restate claims "already pleaded, heard and dismissed in this case" and are "redundant of [NMHA's] prior pleadings."

*Orient Mineral Co. v. Bank of China*, No. 2:98-CV-238BSJ, 2010 WL 624868, at *11 (D. Utah Feb. 19, 2010). Counterclaims II and III(c) rest on the same § 3004(b)(1)(B) theory NMHA pleads as defenses. Doc. 115 at 18-19.

The Court should also decline, under the *Mhoon* factors, to entertain Counterclaims I and II under the Declaratory Judgment Act. Counterclaim I serves no "useful purpose," because it asks the Court to re-decide the status of the track committees, and to re-enter the declaration it dismissed in Doc. 92, on allegations that do not change the analysis. Doc. 92 at 6-8, 12; Doc. 106 at 3. Declining the declaratory counterclaims would create no friction with the state courts. The Racetracks' Count I and tort claims already place NMHA's status before the Court, and the tort claims "necessarily turn on" that status. Doc. 93 at 19. Counterclaim II serves no useful purpose for the reasons stated in Section III.

## VI. THE COURT SHOULD DECIDE THIS MOTION BEFORE NMHA'S RULE 13(h) MOTION.

NMHA's Rule 13(h) motion asks the Court to add Commissioner Smith as a party to these counterclaims and to nothing else. Doc. 111 at 1. If the Amended Counterclaims do not survive, there is nothing to join him to, and joinder would be futile for the reasons in Section IV. If part of them survives, the Court can assess joinder against what remains. The Racetracks request that the Court decide this Motion first, or hold Doc. 111 in abeyance pending its resolution, so that a state officer is not brought in to answer counterclaims that fail as a matter of law. *See* Doc. 114 at 19.

## CONCLUSION

The Racetracks respectfully request that the Court: (1) dismiss the Amended Counterclaims in Doc. 115 and Doc. 116 as against the Racetracks; (2) in the alternative, decline to entertain Counterclaims I and II under the Declaratory Judgment Act; (3) decide this Motion before

NMHA's Rule 13(h) motion [Doc. 111] and deny that motion as futile; and (4) deny Doc. 113 as moot.

Respectfully submitted,

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: */s/ Alex Walker*

Alex C. Walker
Sonya R. Burke
Celina C. Baca
Post Office Box 2168
500 Fourth Street NW, Suite 1000
Albuquerque, New Mexico 87103-2168
Telephone: 505.848.1800
awalker@modrall.com
srbu@modrall.com
celina.baca@modrall.com
*Attorneys for the Racetracks*

WE HEREBY CERTIFY that on the 6th day of November 2026, we filed the foregoing, prepared, reviewed, and verified with the assistance of CoCounsel/Westlaw, electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: */s/ Alex Walker*
Alex C. Walker